249 N.J. Super. 336 (1991)
592 A.2d 572
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
WILLIAM ENGEL AND HERBERT ENGEL, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued November 27, 1990.
Remanded November 29, 1990.
Reargued June 11, 1991.
Decided July 2, 1991.
*346 Before Judges DEIGHAN, BAIME and ARNOLD M. STEIN.
Louis N. Rainone and Jack Arseneault argued the cause for appellant Herbert Engel (Karcher, McDonnell, Rainone & Aftanski, and Jack Arseneault, attorneys; Louis N. Rainone and Jack Arseneault on the brief).
Richard E. Mischel and Linda George argued the cause for appellant William Engel (Greenberg, Margolis, Ziegler, Schwartz, Dratch, Franzblau & Falkin, and Tesoroni, LeRoy & George, attorneys; Richard E. Mischel and Linda George on the brief).
Appellants each filed a supplemental pro se brief.
Linda A. Rinaldi, Deputy Attorney General, argued the cause for respondent (Robert J. Del Tufo, Attorney General, attorney; Ms. Rinaldi of counsel and on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
Following a protracted jury trial, defendants William and Herbert Engel were convicted of conspiracy (N.J.S.A. 2C:5-2) and murder (N.J.S.A. 2C:11-3a(1) and (2)). The jury determined that defendants procured the commission of the killing by the payment of money and were thus eligible for the death penalty (N.J.S.A. 2C:11-3c). At the penalty phase, the jury decided that the aggravating factors did not outweigh the mitigating factors (N.J.S.A. 2C:11-3c(3)). Defendants were thus sentenced to life imprisonment and ordered to serve 30 years without parole eligibility (N.J.S.A. 2C:11-3b). The Law Division denied three separate motions for a new trial. This appeal followed.
Pursuant to leave granted, defense counsel have filed overlength joint briefs and supplemental briefs. In addition, each defendant has filed a pro se brief. Many of the points raised are duplicative. Defendants contend that (1) the indictment was the product of prosecutorial misconduct before the grand jury, (2) the proceedings should not have been conducted as a *347 death penalty case because the aggravating factor relied upon by the State was double counted, (3) their motion to suppress automobile telephone toll records should have been granted, (4) defendant Herbert's motion for a severance was improperly denied, (5) pretrial publicity deprived defendants of a fair trial, (6) the trial judge's evidentiary decisions constituted reversible error, (7) the prosecutor exceeded the bounds of fair comment in his summation, (8) the verdict was the result of impermissible compromise, (9) the first motion for a new trial should have been granted because the verdict was against the weight of the evidence, (10) the second motion for a new trial should have been granted based on the recantation testimony of the State's chief witness, (11) the Law Division abused its discretion in refusing to conduct an evidentiary hearing on the issues raised by the third motion for a new trial, (12) the prosecutor deliberately concealed exculpatory and material evidence, and (13) a new trial is warranted based on newly discovered evidence. We find no error warranting a reversal of defendants' convictions.

I.
On December 14, 1984, Xiomara Engel's body was discovered by South Carolina law enforcement officers in a tire well of a burned-out station wagon. The heat from the fire had been so intense as to cause the windows to explode. Glass fragments were discovered some 20 feet from the automobile. The license plates had been removed and the automobile was totally destroyed by fire. Xiomara's body was burned beyond recognition. It is undisputed that James McFadden had murdered the victim in New Jersey and along with Lewis "Pee Wee" Wright had transported her body to South Carolina where her automobile was set afire. The sole question presented at trial was whether William Engel, Xiomara's former husband, and his brother Herbert procured the killing. In that respect, we disagree with defendants' characterization of the State's evidence as "weak" and "inconclusive." Instead, the voluminous trial record fairly reeks of defendants' guilt.
*348 We recount the evidence in detail. From the inception of their stormy relationship, William was distrustful of Xiomara. At one point, William hired an investigator to monitor the victim's activities, suspecting that she was seeing other men. Although the investigator's probe revealed nothing untoward, William's concerns remained unalleviated. Substantial evidence was presented that William's jealousy often manifested itself in fits of rage during which he confronted Xiomara with unfounded suspicions, and verbally and physically abused her.
At trial, the victim's mother recounted two incidents in September and October 1984 in which William repeatedly struck Xiomara and accused her of being unfaithful. On one occasion, William pushed the victim onto the floor. When Xiomara's mother attempted to intercede, shouting that he might kill her, William replied "that's what she deserves, but not now." On another occasion, she observed William angrily strike Xiomara, apparently cutting her mouth. Similar episodes were observed by the victim's aunt, who threatened to contact the police. William responded that Xiomara "deserve[d]" the beatings, noting that he had "hit her very soft" and that "if [he] beat her hard [he would] kill her."
The marriage of William and Xiomara ended in an annulment. However, William's obsession with the victim continued unabated and resulted in the constant harassment of Xiomara and her family. Both Xiomara's mother and her aunt testified that William would call at all hours of the day and night, often leaving insulting messages containing implications of the victim's alleged promiscuity. William sought to prevent Xiomara from obtaining employment because he was concerned she would meet other men.
After the annulment, Xiomara developed a relationship with Andres Diaz, an attorney for whom she had briefly worked as a secretary. Diaz testified that he suddenly began receiving telephone calls from an individual who identified himself as Raul Valdievia, inquiring whether he "fooled around" with his *349 secretaries. The individual later left a telephone number corresponding to William's residence. Toll records from Decor, a glass etching factory owned by William located in Englewood, disclosed several telephone calls to Diaz's office.
Despite the continued harassment and strife, Xiomara agreed to meet William at his office at Decor in the evening hours of December 13, 1984, in order to purchase birthday and Christmas gifts for their daughter. At approximately 6:30 p.m., Xiomara and her children left their home in North Arlington and obtained take-out dinners at a local restaurant. The victim ate her dinner while driving, explaining to her grandfather whom she had picked up to babysit for her children, that she was to meet William at 7:15 p.m. and was running late. Upon arriving at her apartment, Xiomara dropped off her children and grandfather in the parking lot and left to meet William. At approximately 8:30 p.m., William called Xiomara's apartment and told her grandfather that she had not yet arrived. Sometime later that evening, after the children had gone to bed, William again called and said that Xiomara had apparently missed their appointment.
On the next morning, Xiomara's mother was told by the victim's oldest daughter that she had not come home the night before. Later that morning, William called and told her that Xiomara had never arrived at his office. When Xiomara's mother expressed her intention to contact the police, William suggested that they wait until the afternoon at which time he would accompany her to the police station. However, William never called back. At approximately 11:00 p.m., the victim's mother, accompanied by Diaz, reported Xiomara's disappearance.
The North Arlington police immediately commenced a search for Xiomara's whereabouts. When the search proved unavailing, a teletype was sent to all eastern states. In addition, the police interviewed William at his home. William, who appeared "very nervous" and "chain smoked," told the police that he and *350 Xiomara had arranged to meet the night before. William said that Xiomara called him at 6:00 p.m. to confirm their shopping plans. When she did not arrive as scheduled, William allegedly called her apartment and spoke to her daughter. He said that he received another call from Xiomara at 8:30 p.m. from what he believed to be a public telephone based on the noise of automobiles in the background. Xiomara allegedly told him that she "would be right over." William stated that when Xiomara had not arrived by 8:50 p.m., he called her apartment and again spoke to her daughter, who said her mother was not at home. William said he made another call to Xiomara's apartment at about 9:15 p.m., before leaving his office. William recounted that from his residence he called Xiomara's home again at 10:20 p.m. and then at midnight, each time speaking with her daughter who said her mother was not there. At that point, William claimed to have gone to bed and made no further inquiries until the next morning.
Meanwhile, South Carolina law enforcement officers had found Xiomara's body in the burned stationwagon. The body was finally identified as that of Xiomara several days later after the vehicle identification number was traced to her and her dental records were examined.
William was apprised of his former wife's death during an interview at the Bergen County Prosecutor's office. Upon being told of the circumstances, William placed his hands over his face and "appeared to sob." When he lifted his head, however, the police observed that there were "no tears anywhere on his face or in his eyes" and his voice "did not break" during the remainder of the interview.
James McFadden was the State's chief witness. Under his agreement with the prosecutor, McFadden's testimony was given in exchange for the State's waiver of the death penalty and its promise to recommend that any sentences imposed run concurrently. McFadden testified that he was acquainted with Herbert Engel for approximately three years prior to the murder. *351 In December 1984, McFadden was hired by Herbert as a salesman for Cooper Nationwide, a trucking enterprise. Herbert was the owner of the company. The terms of McFadden's employment were somewhat problematical in that he and Herbert never agreed upon a particular salary or formula for remuneration.
In any event, shortly after he was hired, McFadden was invited to attend a meeting with Herbert at Bennigan's Restaurant in Englewood. Herbert met McFadden at Kassa, a warehouse owned by William, and the two drove to the restaurant. While in the parking lot before entering the restaurant, Herbert asked McFadden, "are you bad?" McFadden asked Herbert what he meant, and Herbert simply repeated the question. Still confused, McFadden responded "if somebody hurts me, make [sic] me mad, I would hurt somebody, ... [t]hat's normal." The two men then proceeded into the restaurant and sat at the bar.
While seated at the bar, another man who was identified to McFadden as Herbert's cousin, joined them. After a brief conversation, the man who McFadden later learned was Herbert's brother William, walked to a nearby booth. While McFadden remained at the bar, Herbert followed William to the table where they engaged in an animated conversation. After William left the restaurant, Herbert returned to the bar and told McFadden that "his cousin had a girlfriend [who] was hassling [him], giving him a hard time, [and] that he wanted this girlfriend taken care of, [taken] off the map." Herbert said that his "cousin" would pay $25,000 for the proposed killing. Taken aback by Herbert's offer, McFadden did not immediately respond.
At Herbert's request, a second meeting occurred several days later, again at Bennigan's. Herbert repeated William's offer to pay him $25,000 to kill his "girlfriend." At this point, McFadden agreed to the proposal. Herbert insisted that the killing take place on the following Friday evening. However, Herbert *352 later telephoned McFadden at Cooper Nationwide and stated that "the situation had changed" and that he was to meet him at Kassa at 5:00 p.m. on Thursday instead.
In accordance with their agreement, on the designated date, McFadden took a cab from his home in Passaic Park to Kassa, arriving at approximately 5:15 p.m. McFadden brought with him an attache case containing a wire cord he had taken from the back of a refrigerator. The cab driver dropped McFadden off directly in front of the entrance to Kassa. The parking lot was empty, with the exception of Herbert's automobile. McFadden walked up to the door and Herbert "buzzed him in." The two immediately proceeded to Herbert's office where McFadden showed Herbert the cord he intended to use in killing the victim. Herbert then asked whether McFadden had a gun. When McFadden replied that he did not, Herbert opened his briefcase which contained a revolver.
At that point, Herbert described in detail his plan to kill the victim. Herbert explained that his cousin and the intended victim would enter a hallway located on the left side of the building. McFadden was to remain hidden in a nearby bathroom. Herbert told McFadden to "strangle" the victim when his "cousin ... pretended to turn on the light." Pursuant to Herbert's suggestion, the two went to a storage area and obtained a "film plastic" to cover the body. McFadden was to transport the body to Otlanta, South Carolina, the home of his grandparents. For this purpose, McFadden gave Herbert his grandparents' telephone number. Herbert then showed McFadden which garage door would be unlocked, noting that the burglar alarm had been disengaged. When the two returned to Herbert's office, McFadden was given $1,300 in cash. Herbert suggested that McFadden have the victim's automobile "crushed." He also proposed that the body be placed in a hole and covered with acid. Although McFadden's response was somewhat equivocal, Herbert gave him a pair of "acid gloves" made of thick rubber with sleeves "going up to the elbow." After receiving a telephone call, Herbert told McFadden that *353 the victim had arrived and "would be coming to Kassa from Decor." Herbert then departed, leaving McFadden hidden in the bathroom with the door slightly ajar.
Approximately ten minutes later, William arrived with Xiomara. The lights in the bay area had been extinguished. As planned, William walked into the bay area, turned left and fumbled around with the light switch. Exclaiming that the light was defective, William obtained a flashlight. Xiomara followed William to the "far corner of the bay." When Xiomara passed the bathroom, McFadden jumped out, slipped the "cord around her neck and started pulling it tight" in cross-wrist fashion. Xiomara fell to the floor and McFadden straddled her, pulling tightly on the cord. McFadden strangled Xiomara for approximately four minutes while William stood over the victim, smoking a cigarette. At one point while McFadden was still strangling Xiomara, William exclaimed, "you bitch."
After McFadden finally released his hold on the victim, he went outside, as planned, through the garage door that Herbert had said would be unlocked and disconnected from the alarm system. Using the key that Herbert had given him previously, McFadden backed Xiomara's stationwagon into the garage. With William's assistance, McFadden threw Xiomara's lifeless body into the stationwagon. While McFadden covered the body, William disappeared. McFadden then suddenly heard a police radio from a distance.
William returned to the bay area in an agitated state and told McFadden that the police were outside. Upon hearing a knock on the door, McFadden instructed William to tell the police that he owned the factory and that nothing was amiss. McFadden then hid in the bathroom while William dealt with the police. William returned shortly thereafter and told McFadden that he would "circle" the area to "make sure everything was okay" and would "blow his horn twice" to signal when it was safe to *354 leave. Fearing that he "was being set up," McFadden did not wait for the signal but instead left in Xiomara's stationwagon.
McFadden then drove to Cooper Nationwide where he met Pee Wee Wright, one of the Engel's employees. Wright had previously agreed with McFadden to accompany him on the ride to South Carolina.
The two then drove off in Xiomara's automobile. While Wright was not part of the original plan and allegedly was unaware of the presence of the victim's body in the automobile, McFadden had agreed to pay him $2,000 to share the driving. Although the ride was otherwise uneventful, the two repaired a flat tire immediately past the Lewisburg exit in North Carolina. At that point, Wright noticed a gray pocketbook under the front seat of the stationwagon. McFadden emptied the contents of the pocketbook and gave $100 to Wright. The only mention of the presence of the body in the car came from Wright who said "[w]hat man would pay me $2,000 to help him drive a car down south unless there was a body in it or something." McFadden did not respond.
Upon arriving in South Carolina on Friday, December 14, McFadden gave Wright an additional $100 to buy clothes, took a shower and went to sleep. Sometime later, McFadden was awakened by his brother, Clyde, who told him that he had received a telephone call. Picking up the receiver, McFadden heard Herbert's voice. Herbert asked McFadden whether "the package [was] delivered [and whether] everything [was] okay." McFadden responded that the killing had gone undetected.
When Wright returned from his shopping excursion, he told McFadden that he had noticed "blond hair in the back of the car." Angered by the fact that he had been kept ignorant of the presence of the body, Wright told McFadden that he "could have instruct[ed] [him] how to handle it better." Wright then asked McFadden for the car keys, stating that he was "going to burn" the automobile. McFadden responded that his "nerves [were] shot" and that he "wanted nothing else to do with it." *355 McFadden added, however, that he had been instructed by his "boss" to remove the license plates.
Approximately two hours later, Wright returned and advised McFadden that the car had been destroyed and that "it was a blaze of glory." The two went to a local bar to celebrate, along with McFadden's uncle and his girlfriend. McFadden and Wright then took a train to New Jersey, arriving at approximately 10:00 a.m. on Saturday.
McFadden met Herbert on Monday afternoon, December 17, at Cooper Nationwide. From there, the two men drove to a local bar where McFadden was given a plain white envelope containing $5,000 in cash. Once inside the bar, Herbert closely questioned McFadden with respect to the killing, asking whether "everything [was] taken care of [as they had] planned." McFadden told him that he had followed the plan, hiding the fact that he had neither used acid in disposing of the body nor had the stationwagon "crushed," as Herbert had proposed. After leaving the bar, McFadden gave Wright the $2,000 he had promised.
McFadden next met Herbert "a few days later" at a bar in Clifton. Herbert told McFadden that "he needed to know everything... because they had found the package." Apparently, Herbert had become aware of the fact that Wright had accompanied McFadden to South Carolina and had disposed of the body and the automobile. McFadden thus gave Herbert a truthful account of all that had occurred. Herbert merely inquired whether "everything [had been] burned up."
McFadden's last meeting with Herbert before his arrest took place on January 12, 1985. Herbert had contacted McFadden and had demanded that they meet because "there was a problem." When McFadden arrived, Herbert told him he wanted him to "take care of" Wright because he "was bad news." McFadden did not agree to kill Wright, but he assured Herbert he would "take[] care" of things. He also accepted $1,000 in cash from Herbert.
*356 McFadden was arrested on January 18, 1985. At that time, McFadden agreed to give a statement, noting that had he not been arrested he would have confessed in any event because the killing "was bothering [his] conscience." McFadden described the killing in lurid detail and fully apprised the police of the Engels' involvement. In addition, McFadden was shown a photograph of Xiomara and William together. He identified Xiomara as the woman he had strangled and William as the man who had been present and had witnessed the killing.
At trial, McFadden's graphic account of the events was strongly corroborated by the testimony of other witnesses and tangible evidence. We need not recount at length all of the corroborative aspects of the State's proofs. Instead, we provide a brief summary of this evidence.
Officers Scott Jenkins and Tim Torell of the Englewood Police Department testified that they responded to a burglar alarm call at Kassa at 8:00 p.m. on Thursday, December 13, 1984. Upon their arrival, they observed a dark colored Cadillac (Herbert's automobile) parked in the adjacent lot. After knocking at the door, the officers observed a "dark-haired man" in a "dark-colored business suit" whom they later identified as William Engel, appear at the window. The officers identified themselves and stated that the burglar alarm had been activated. William gestured from inside the building that "everything was okay," and then very quickly went out of the officers' sight. Their suspicions aroused, the officers remained at the entrance until William reappeared. Officer Jenkins ordered William to open the door. William complied, but immediately stepped outside, closing the door behind him. Although William answered the officers' questions in an evasive fashion, Officer Jenkins recognized him as the owner of the building and, therefore, terminated any further inquiry. However, both officers observed that William was "very nervous" and "wideeyed" and that he was perspiring profusely.
*357 Wright testified and confirmed McFadden's account of their ride to South Carolina. During the trip, Wright noticed a purse under the front seat containing driver's credentials, credit cards and cash. McFadden told Wright that he could keep the money. Wright noticed that the name on the driver's license was Xiomara Engel. McFadden told Wright that he had heroin and cocaine in the automobile. Wright noticed that McFadden had a large "roll of bills" which he repeatedly exhibited. Wright verified that he first became aware of Xiomara's body in the stationwagon after they arrived in South Carolina. Wright testified that he noticed blond hair protruding from a plastic canvas in the rear compartment of the automobile. When he pulled off the canvas, Wright discovered Xiomara's body. Wright also described how he removed the license plates, poured gasoline on the body and the car and set both afire.
Telephone toll records were introduced, contradicting much of William's version of the events immediately preceding the murder. For example, the records disclosed that William had called Xiomara's apartment at 8:37 p.m. on December 13, 1984. Had Xiomara telephoned William to tell him that she was on her way to meet him at Decor, as William told the police, he would have had no reason to call her home at 8:37 p.m., a mere seven minutes later to find out where she was. William had also told the police that he called Xiomara's apartment sometime between 9:10 p.m. and 9:15 p.m., when he left his office. However, no call appeared on Decor's toll records to Xiomara's apartment after the 8:37 p.m. call. Moreover, the records disclosed a telephone call from William's automobile at 8:56 p.m. This contradicted William's account that he remained in his office until 9:15 p.m. William also claimed that he continued telephoning Xiomara's apartment from his home throughout the night of December 13 and the early morning hours of December 14. However, the toll records for William's home revealed no calls to Xiomara's apartment on those dates. Toll records also indicated that Herbert telephoned McFadden's *358 grandparents' house on December 14, as both Wright and McFadden testified. Herbert denied making those calls when questioned by the police.
For reasons that will become apparent later in our opinion, we describe the evidence pertaining to cause of death in some detail. The trial record discloses that an autopsy was performed on Xiomara's body on December 15, 1984, by Dr. Damien DiCostanzo, a member of the South Carolina Medical Examiner's Office. At trial, Dr. DiCostanzo testified that the body was "extensively charred and burned." He stated that the victim was "definitely dead" before the fire. The witness estimated that Xiomara had been killed between 18 and 24 hours prior to the fire and that she had died within two hours after eating.
Due to extensive damage to the body caused by the fire, Dr. DiCostanzo was unable to arrive at a conclusion with respect to the cause of death. He noted that the back and sides of the skull were largely missing and the brain was extremely distorted. Dr. DiCostanzo surmised that the heat of the fire had elevated the pressure within the victim's body to such an extent that the skull exploded. What remained of the brain was "herniated outward." The doctor noted that his examination of the remaining portion of the skull revealed no hemorrhage or fracture which might support a finding that death was caused by "blunt" or "penetrating" trauma. Because much of the skull was missing, however, Dr. DiCostanzo was unable to exclude head trauma as a cause of death.
In the course of his examination, the doctor removed the larynx or breathing tube. Apparently, Dr. DiCostanzo found it necessary to break the larynx in order to remove it. Because he had not observed any breaks in the larynx and hyoid bone, he assumed that they had not been broken before the victim died. However, he found nothing in his examination that would be inconsistent with either manual or ligature strangulation.
*359 A second autopsy was performed by Dr. Rudolf Platt, an assistant Essex County Medical Examiner. Dr. Platt's involvement in the case was at the behest of the victim's mother. Although Dr. Platt had sought and obtained the approval of the State Medical Examiner, his examination of the victim's body apparently was not part of his official duties.
Dr. Platt found that the superior horns of the thyroid cartilage had been fractured and contained a small area of hemorrhage. This indicated to the doctor that the hemorrhage had occurred prior to death. He also examined the hyoid bone and found that it was fractured and contained traces of hemorrhage. Based on these facts, Dr. Platt concluded that the victim had died by strangulation. He noted further that even in the absence of the fractured hyoid bone and thyroid cartilage, he would have found that the victim had been strangled. The doctor's examination of the victim's neck tissues indicated strangulation as the cause of death.
Defendants elected not to testify. Based on the foregoing evidence, the jury found defendants guilty of conspiracy to commit murder and murder. We now address the arguments advanced in the copious briefs submitted.

II.
We first consider defendants' argument that the indictment was tainted by prosecutorial misconduct before the grand jury. At the outset, we stress that the grand jury is not the prosecutor's playtoy. We are disturbed by some of the practices employed by the prosecutor in this case. Nevertheless, we are convinced that such prosecutorial excesses as did occur did not render the proceedings fundamentally unfair or deprive defendants of their right to due process.
We begin with the well settled principle that an indictment returned by a properly constituted grand jury is presumed valid, and should not be vitiated except on the "clearest and plainest ground." State v. New Jersey Trade Waste Ass'n, 96 *360 N.J. 8, 18-19, 472 A.2d 1050 (1984); State v. Weleck, 10 N.J. 355, 364, 91 A.2d 751 (1952); State v. Clarke, 198 N.J. Super. 219, 228, 486 A.2d 935 (App.Div. 1985); State v. Porro, 158 N.J. Super. 269, 281, 385 A.2d 1258 (App.Div. 1978), cert. den. 439 U.S. 1047, 99 S.Ct. 724, 58 L.Ed.2d 706 (1978). Unless the prosecutor's misconduct "is extreme and clearly infringes upon the [grand] jury's decision-making function," an otherwise valid indictment should not be dismissed. State v. Buonadonna, 122 N.J. 22, 48-49, 583 A.2d 747 (1991); State v. Schamberg, 146 N.J. Super. 559, 564, 370 A.2d 482 (App.Div. 1977), certif. den. 75 N.J. 10, 379 A.2d 241 (1977). See also State v. Hart, 139 N.J. Super. 565, 569, 354 A.2d 679 (App.Div. 1976). In that respect, it has been said that dismissal of an indictment "is appropriate only `if it is established that the violation substantially influenced the grand jury's decision to indict,'" or if there is "grave doubt" that the determination ultimately reached was arrived at fairly and impartially. Bank of Nova Scotia v. United States, 487 U.S. 250, 256, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228, 238 (1988), quoting United States v. Mechanik, 475 U.S. 66, 78, 106 S.Ct. 938, 945, 89 L.Ed.2d 50, 61 (1986). When a person's fate is before a grand jury, he is "constitutionally entitled to have his case considered by an impartial and unbiased" body capable of deciding the issue of probable cause on the evidence fairly submitted to it. United States v. Burke, 700 F.2d 70, 82 (2nd Cir.1983), cert. den. 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983), citing Lawn v. United States, 355 U.S. 339, 349-350, 78 S.Ct. 311, 317-318, 2 L.Ed.2d 321, 329-330 (1958); and Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 408-409, 100 L.Ed. 397, 402 (1956). However, an indictment may be dismissed only upon a "palpabl[e]" showing of fundamental unfairness, State v. Wein, 80 N.J. 491, 501, 404 A.2d 302 (1979), or where the conduct of the prosecutor amounted to an "intentional subversion" of the grand jury process. State v. Murphy, 110 N.J. 20, 35, 538 A.2d 1235 (1988).
*361 Applying these principles, we find no prosecutorial dereliction warranting vitiation of the indictment. In their voluminous briefs, defendants have alleged a plethora of prosecutorial errors. We do not comment on all of them. Instead, we note that (1) it was not unreasonable for the prosecutor to present evidence concerning William's stormy relationship with Xiomara, (2) Investigator Love's comment that his investigation corroborated McFadden's account of the events which occurred in South Carolina was not improper, (3) defendants' post-arrest statements to persons other than law enforcement officials, if any such statements were in fact made, did not violate the Engels' privilege against self-incrimination, (4) the prosecutor's comments concerning what charges could be instituted against Wright, although perhaps incomplete and somewhat misleading, did not have the capacity to impair defendants' rights, and (5) the prosecutor's instructions, while not a model of clarity, were not of such a nature as to have tainted the grand jury's determination. Even if one or more of these instances constituted error, however, we are convinced that defendants were not prejudiced.
We agree with defendants that the prosecutor should not have presented evidence concerning William's alleged mistreatment of his first wife. The prosecutor also erred by attempting to show that the Engels had contemplated concocting a story concerning Xiomara being involved in prostitution or having a romantic relationship with McFadden, where the record does not in any way support a conclusion that the State had evidence of such a fabrication. So too, the prosecutor should not have referred to defendants' incarceration or the fact that they were denied bail.
Despite these errors, we are satisfied that the grand jury proceedings were fair and the indictment was properly returned. While we do not endorse all of the prosecutor's tactics or methods, we discern no course of conduct impairing the grand jury's capacity to fairly decide the issues before it.

*362 III.
We next address defendants' argument that the Law Division judge erroneously denied their pretrial motion to strike the aggravating factor set forth in N.J.S.A. 2C:11-3c(4)(e), i.e., the offender "procured the commission of the offense by payment or promise of payment of anything of pecuniary value." Defendants did not contend below, nor do they urge here, that this aggravating factor was without evidential support. See State v. McCrary, 97 N.J. 132, 140, 478 A.2d 339 (1984). Rather, they mount a constitutional challenge to the death penalty statute, contending that it is improper to utilize a death eligibility standard as an aggravating factor. They assert that because procuring a killing by the payment of money constitutes an element of capital murder, it may not be double-counted as an aggravating factor. Aggravating factors must genuinely narrow the class of persons eligible for the death penalty and must be such as to justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder. Defendants claim that an aggravating circumstance which merely repeats an element of the underlying crime cannot perform this narrowing function.
Preliminarily, we entertain serious doubt that defendants have standing to challenge the constitutionality of N.J.S.A. 2C:11-3c(4)(e). The simple and overriding fact is that the jury did not return the death penalty in this case. Although the trial proceeded as a capital murder case with all of the corresponding special procedures, defendants are no longer subject to the potential of a death sentence. Their present situation is no different than that of others convicted of capital murder but sentenced to life imprisonment.
Under these circumstances, we question whether defendants have sustained or are in immediate danger of sustaining some direct injury as a result of the death penalty law. It is a tenet of our judicial system that courts will not render judgments on constitutional questions unless presented in the *363 form of an actual factual or legal dispute. State v. Jones, 198 N.J. Super. 553, 558, 487 A.2d 1278 (App.Div. 1985). Deeply embedded in our jurisprudence is the settled principle against resolving disputes "in advance of constitutional necessity." Id. at 559, 487 A.2d 1278. Our authority is confined to deciding questions presented in an adversary context and in a form capable of resolution through the judicial process. Id. at 559-560, 487 A.2d 1278. See also Flast v. Cohen, 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947, 958 (1968); United States v. Fruehauf, 365 U.S. 146, 157, 81 S.Ct. 547, 553-554, 5 L.Ed.2d 476, 483 (1961); Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, 89 L.Ed. 1725, 1734 (1945); Muskrat v. United States, 219 U.S. 346, 356, 31 S.Ct. 250, 253, 55 L.Ed. 246, 250 (1911). In short, we have no "roving commission to seek and destroy unconstitutionality." In re Ass'n of Trial Lawyers of America, 228 N.J. Super. 180, 185, 549 A.2d 446 (App.Div. 1988), certif. den. 113 N.J. 660, 552 A.2d 180 (1988).
Putting aside questions of standing, we find no merit in defendants' argument. We do not write upon a blank slate. While the precise issue raised here was not before it, our Supreme Court in State v. Ramseur, 106 N.J. 123, 524 A.2d 188 (1987), nevertheless considered the question and found nothing constitutionally infirm in the statutory scheme. Specifically, the Court stated:
[t]here is one class of murder in which a factor defines both death eligibility as well as selection for the penalty itself. The defendant who pays another to commit knowing or purposeful murder and is therefore death eligible (See. c) will, without proof of any further aggravating factor (since such payment itself is an aggravating factor, Sec. c(4)(e)), be subject to the death penalty if that aggravating factor outweighs any mitigating factors. But there is nothing whatsoever unconstitutional about that. The definition of the circumstance is precise, and the penalty therefor consistent. [Id. at 188, 524 A.2d 188; footnote omitted. Emphasis supplied].
See also Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); State v. Harding, 137 Ariz. 278, 670 P.2d 383, 401-402 (1983) (Gordon, V.C.J., specially concurring), cert. *364 den. 465 U.S. 1013, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984); Antone v. State, 382 So.2d 1205, 1216 (Fla. 1980), cert. den. 449 U.S. 913, 101 S.Ct. 287, 66 L.Ed.2d 141 (1980); Hopkinson v. State, 664 P.2d 43, 74 (Wyo. 1983).
More recently, the Court considered the identical question presented by this case. Adhering to its holding in Ramseur, the Court in State v. Marshall, 123 N.J. 1, 586 A.2d 85 (1991), found "no constitutional infirmity exists because the aggravating factor ... mirrors an element of the offense of which the defendant was convicted." Id. at 138, 586 A.2d 85. Whatever doubt that may have existed regarding the issue has now been dispelled.
We recognize that defendants' argument is predicated upon the State Constitution. The Court's opinion in State v. Marshall does not distinguish between the New Jersey Constitution and its federal counterpart. In any event, we reject defendants' invitation to construe our State Constitution more expansively. Instead, we are entirely satisfied that New Jersey's statutory scheme genuinely narrows the class of persons eligible for the death penalty. That factor 4(e) also constitutes an aggravating circumstance to be considered in determining the appropriate penalty is neither fundamentally unfair nor constitutionally offensive.

IV.
Defendants argue that the trial judge erred by denying their pretrial motion to suppress automobile toll records obtained from Nynex Mobile Communications Retail Company in New York State. Nynex is a Delaware corporation with a registered agent in New Jersey. However, toll records are maintained only in its New York State office. As part of its investigation, the Bergen County Prosecutor's office sought to obtain the toll records for defendants' automobile telephones. Upon contacting Rockland County law enforcement officials, members of the prosecutor's office were told that, unlike New *365 Jersey, New York State does not require a warrant in order to obtain telephone toll records. Because judicial authorization was not required in New York State, Rockland County officials obtained defendants' toll records and supplied them to the Bergen County Prosecutor. Defendants contend that the Rockland County officials secured the toll records as agents of the Bergen County Prosecutor. They assert that the records should have been suppressed because they were obtained without a warrant.
The question presented is whether the trial court should have excluded the telephone records on the ground that, although lawfully seized without a warrant under New York and Federal law, the seizure would have violated the New Jersey Constitution if it had occurred in this state. The issue is a product of the constitutional heterogeneity that marks our system of federalism.
The United States Supreme Court has determined that there is no expectation of privacy in long distance toll records maintained by a telephone company. Smith v. Maryland, 442 U.S. 735, 740-741, 99 S.Ct. 2577, 2580-2581, 61 L.Ed.2d 220, 226-227 (1979). Justice Blackmun, writing for the majority, reasoned that people do not generally entertain any actual expectation of privacy in the numbers dialed because the telephone company must be made aware of the number in order to effectuate the call, bill the caller, and use the information for other legitimate reasons. Ibid. The Court found that a person has no legitimate expectation of privacy in information voluntarily turned over to third parties. Id. at 742, 99 S.Ct. at 2581, 61 L.Ed.2d at 228.
Many states, including New York, have followed the lead of the United States Supreme Court and have found no expectation of privacy respecting telephone records under their constitutions. See, e.g., People v. Di Raffaele, 55 N.Y.2d 234, 448 N.Y.S.2d 448, 433 N.E.2d 513 (1982). In State v. Hunt, 91 N.J. 338, 450 A.2d 952 (1982), however, our Supreme Court departed *366 from this approach, finding that our Constitution required application of a different standard rather than deference to the federal provision. Id. at 345-346, 450 A.2d 952. The Court said that it was "unrealistic" to assume that the cloak of privacy has been shed because the telephone company and its employees are aware of telephone billing records. Id. at 347, 450 A.2d 952. Thus, under our Constitution, telephone toll records can be obtained only by a warrant issued upon a finding of probable cause. Id. at 348, 450 A.2d 952.
At the outset, we acknowledge that our State Constitution does not simply mirror its federal counterpart, but instead constitutes a basis for independent rights and protections that are available and applicable to the citizens of New Jersey. State v. Mollica, 114 N.J. 329, 352, 554 A.2d 1315 (1989). See also PruneYard Shopping Center v. Robins, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). In a variety of factual settings, our Supreme Court has found that the State Constitution accords protections that exceed those provided under the federal constitution. See, e.g., State v. Gerald, 113 N.J. 40, 549 A.2d 792 (1988); State v. Hunt, 91 N.J. at 344, 450 A.2d 952; Right to Choose v. Byrne, 91 N.J. 287, 450 A.2d 925 (1982); State v. Slockbower, 79 N.J. 1, 397 A.2d 1050 (1979); State v. Johnson, 68 N.J. 349, 346 A.2d 66 (1975). Specifically, the Court has held that the search and seizure provisions in the federal and New Jersey Constitutions are not always coterminous, despite the congruity of the language. State v. Hunt, 91 N.J. at 344, 450 A.2d 952; State v. Alston, 88 N.J. 211, 225-226, 440 A.2d 1311 (1981); State v. Schmid, 84 N.J. 535, 557, 423 A.2d 615 (1980). Although New Jersey did not apply the exclusionary rule prior to the United States Supreme Court's decision in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), see Eleuteri v. Richman, 26 N.J. 506, 141 A.2d 46 (1958), cert. den. 358 U.S. 843, 79 S.Ct. 52, 3 L.Ed.2d 77 (1958); State v. Alexander, 7 N.J. 585, 83 A.2d 441 (1951), cert. den. 343 U.S. 908, 72 S.Ct. 638, 96 L.Ed. 1326 (1952); State v. Guida, 118 N.J.L. 289, 192 A. 445 (Sup.Ct. 1937), aff'd 119 *367 N.J.L. 464, 196 A. 711 (E. & A. 1938); State v. Merra, 103 N.J.L. 361, 137 A. 575 (E. & A. 1927); State v. Cortese, 104 N.J.L. 447, 139 A. 923 (E. & A. 1927); State v. Lyons, 99 N.J.L. 301, 122 A. 758 (E. & A. 1923), "[d]uring the past twenty-five years it has consistently been applied to exclude from the State's case-in-chief evidence illegally obtained through warrantless searches or in reliance on defective warrants." State v. Novembrino, 105 N.J. 95, 148, 519 A.2d 820 (1987).
Recently, our Supreme Court held that our State constitutional protections against unreasonable searches and seizures governed the legality of the actions of federal officers in New Jersey if they have acted with the cooperation or assistance of our own state officers. In State v. Mollica, supra, federal law enforcement officers without a search warrant obtained hotel billing records relating to the use of an occupant's room telephone. They then turned these records over to state law enforcement officers who, using this information, obtained warrants and undertook a search of defendants' hotel rooms, seizing evidence of gambling offenses. While recognizing that the federal officials had complied with federal constitutional principles, the Court found that the validity of the seizure of evidence depended upon the relationship of the law enforcement officers. 114 N.J. at 355, 554 A.2d 1315. The Court thus remanded the matter to the Law Division to determine whether the federal agents were acting "under `color of state law'" when they seized the evidence without a warrant. Ibid. The Court indicated that "antecedent mutual planning, joint operations, cooperative investigations, or mutual assistance" may sufficiently establish intergovernmental agency so as to bring the conduct of the federal officials under the color of state law and the mandate of our Constitution. Id. at 356, 554 A.2d 1315.
Notwithstanding some superficial similarity, the facts here are materially different. We are not concerned with the seizure of evidence in this State inconsistent with the mandate of the New Jersey Constitution. Instead, the evidence was obtained in New York State, a jurisdiction not subject to our *368 constitutional provision. We perceive no jurisprudential principle requiring, or even permitting, us to give extraterritorial effect to our Constitution. Recognition of this inherent jurisdictional limitation on the application of our Constitution is consonant with recognized principles of federalism.
So too, none of our constitutional values are genuinely threatened by application of the law of the jurisdiction where the search and seizure occurred. See In re Mahler, 177 N.J. Super. 337, 351-352, 426 A.2d 1021 (App.Div. 1981), certif. den. 87 N.J. 349, 434 A.2d 93 (1981); State v. Konzelman, 204 N.J. Super. 389, 498 A.2d 1301 (Law Div. 1985). An essential objective of the remedial exclusionary rule and our constitutional protection against unreasonable search and seizure is to deter unlawful police conduct. See Delguidice v. New Jersey Racing Comm'n, 100 N.J. 79, 494 A.2d 1007 (1985). These constitutional protections may also implicate concerns of judicial integrity. Id. at 88-89, 494 A.2d 1007. The exclusionary rule further serves to indicate the importance of an individual's state constitutional right to be free from unreasonable search and seizure. State v. Novembrino, 105 N.J. at 105, 519 A.2d 820.
Clearly, the policy of deterrence would not be furthered by application of our State Constitution to the lawful seizure of evidence in New York. The central purpose of the exclusionary rule is not to rectify a wrong already done, but deter future insolence in office by those charged with enforcement of the law. The objective is to compel respect for the constitutional guaranty in the most effective way  by removing the incentive to disregard it. No one can reasonably deny the need for some remedy for a breach of our constitutional protection against unlawful searches. The question is "whether suppression of the truth with the consequent [strong possibility of an] acquittal of the guilty is a fair and effective measure to that end." State v. Bisaccia, 58 N.J. 586, 589, 279 A.2d 675 (1971).
In that context, no purpose of deterrence has been frustrated in this case. Whether or not New York State officials acted as *369 agents of the Bergen County Prosecutor, the fact remains that the seizure was in accordance with the law of the jurisdiction in which it took place. Since the seizure was not illegal where it occurred, exclusion would serve no deterrent effect.
In a similar vein, judicial integrity is not imperiled because there has been no misuse or perversion of the judicial process. Of course, we recognize that government teaches by example and that if the government becomes a lawbreaker, its actions breed contempt for the rules. We acknowledge that it is morally incongruous for the government to flout constitutional rights and at the same time demand that its citizens obey the law. However, here the good faith of the officers cannot be doubted. By permitting the admission of the seized evidence, we are not lending our aid to a lawless venture. See Tullis & Ludlow, Admissibility of Evidence Seized in Another Jurisdiction: Choice of Law and the Exclusionary Rule, 10 U.S.F.L.Rev. 67-91 (1975-1976).
Further, no citizen's individual constitutional rights fail of vindication because there has been no violation of the law of the state where the seizure occurred. The toll records were not encompassed within a zone of privacy recognized under New York law. Defendants' constitutional rights are not offended by the admission of the evidence seized in accordance with that jurisdiction's constitution. See People v. Blair, 25 Cal.3d 640, 159 Cal. Rptr. 818, 602 P.2d 738 (1979) (en banc); Echols v. State, 484 So.2d 568 (Fla. 1985); Commonwealth v. Bennett, 245 Pa.Super. 457, 369 A.2d 493 (1976).
In sum, the exclusionary rule must be anchored to the reasons for its creation. This is not to belittle the rights consecrated in our organic law, but rather to insure that they are not applied so as to defeat their essential purpose. We discern no sound basis to apply New Jersey's constitutional mandate to a seizure of evidence made lawfully in a neighboring state.

*370 V.
We reject Herbert's contention that the trial court abused its discretion by denying his pretrial motion for a severance. We stress that disposition of a motion for a severance is addressed to the sound discretion of the trial court under R. 3:15-2 and will not be reversed in the absence of a clear abuse. See State v. Laws, 50 N.J. 159, 175, 233 A.2d 633 (1967), cert. den. 393 U.S. 971, 89 S.Ct. 408, 21 L.Ed.2d 384 (1968); State v. Manney, 26 N.J. 362, 368, 140 A.2d 74 (1958); State v. Rosenberg, 37 N.J. Super. 197, 202, 117 A.2d 168 (App.Div. 1955), certif. den. 20 N.J. 303, 119 A.2d 789 (1956). We perceive no mistaken exercise of discretion in this case.
A severance should not be granted "merely because it would offer defendant a better chance of acquittal." State v. Morales, 138 N.J. Super. 225, 231, 350 A.2d 492 (App.Div. 1975). Rather, it is incumbent on the trial court to weigh the interests of judicial economy and efficiency against the right of every accused to have the merits of his case fairly decided. State v. Aiello, 91 N.J. Super. 457, 466, 221 A.2d 40 (App.Div. 1966), certif. den. 48 N.J. 138, 224 A.2d 324 (1966), cert. den. 388 U.S. 913, 87 S.Ct. 2106, 18 L.Ed.2d 1351 (1967). The issue is not the respective weights or amounts of the evidence, but the fairness of the trial to each defendant. State v. Laws, 50 N.J. at 175, 233 A.2d 633. Undoubtedly, "[t]he danger of prejudice by association underlies all joint trials." State v. Freeman, 64 N.J. 66, 68, 312 A.2d 143 (1973). "But a mere possibility of such harm is not enough to [require a severance], [for] if it were, nothing would remain of the [joinder and consolidation] rule." State v. Manney, 26 N.J. at 368, 140 A.2d 74. Instead, the peril of prejudice by association can generally be defeated by forceful instructions to consider each defendant separately. State v. Scioscia, 200 N.J. Super. 28, 43, 490 A.2d 327 (App.Div. 1985), certif. den. 101 N.J. 277, 501 A.2d 942 (1985).
We perceive no possible prejudice to Herbert in view of the trial court's repeated and carefully worded instructions on the *371 subject of separate verdicts. We recognize that a substantial portion of the State's proofs pertained solely to William. Much of the State's evidence related to William's prior mistreatment of the victim, as our recital of the facts plainly demonstrates. However, we have also stressed that the evidence relating solely to Herbert's involvement in the killing was equally substantial. We are not concerned with a defendant who played a minor role in the conspiracy. Rather, Herbert directly solicited McFadden's help in killing the victim. The evidence reflected that Herbert planned the killing in great detail. Against this backdrop, we have no reason to doubt the jury's ability to comply faithfully with the judge's instruction.

VI.
Equally without merit is defendants' argument that they were denied their right to a fair trial due to the extensive pretrial publicity generated by this case. While we acknowledge that the media devoted substantial attention to this case, nothing in the record supports defendants' claim that the jury's ability to be fair was in any way tarnished.
Our decisions are in accord with those of the United States Supreme Court distinguishing between cases in which the trial atmosphere is so corrupted by publicity that prejudice may be presumed, see Sheppard v. Maxwell, 384 U.S. 333, 352, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600, 614 (1966); Estes v. Texas, 381 U.S. 532, 542-544, 85 S.Ct. 1628, 1632-1634, 14 L.Ed.2d 543, 550-551 (1965); Turner v. Louisiana, 379 U.S. 466, 472-473, 85 S.Ct. 546, 549-550, 13 L.Ed.2d 424, 429 (1965); Rideau v. Louisiana, 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663, 665 (1963); Marshall v. United States, 360 U.S. 310, 312-313, 79 S.Ct. 1171, 1172, 3 L.Ed.2d 1250, 1252 (1959), and cases in which pretrial publicity, while extensive, is less intrusive, requiring only that the jury's ability to be impartial be closely scrutinized. See Patton v. Yount, 467 U.S. 1025, 1032, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847, 854 (1984); Dobbert v. Florida, *372 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344, 362 (1977); Murphy v. Florida, 421 U.S. 794, 800-803, 95 S.Ct. 2031, 2036-2037, 44 L.Ed.2d 589, 595-597 (1975). State v. Biegenwald, 106 N.J. 13, 33-34, 524 A.2d 130 (1987). This case falls in the latter category. The publicity, as described in the record, was not pervasive. We are thus not required to presume prejudice. See State v. Williams, 93 N.J. 39, 63, 66 n. 10, 459 A.2d 641 (1983). The appropriate inquiry is whether the jury selection process resulted in a fair and impartial jury. State v. Marshall, 123 N.J. at 78, 586 A.2d 85.
There is no evidence that any of the jurors ultimately impaneled was biased or tainted, or in any way unable to objectively consider only the evidence presented in court. Although defense counsel were denied the opportunity to participate actively in the voir dire, we discern no prejudice on that account. See State v. Biegenwald, 106 N.J. at 29, 524 A.2d 130; State v. Manley, 54 N.J. 259, 281-283, 255 A.2d 193 (1969); State v. Halsey, 218 N.J. Super. 149, 160-162, 526 A.2d 1165 (Law Div. 1987). The jury actually selected was entirely impartial.
We also note that the trial court repeatedly inquired throughout the trial whether the jurors had read or heard media accounts of the case. State v. Williams, 93 N.J. at 62, 459 A.2d 641. The Law Division judge meticulously satisfied his "overarching constitutional responsibility" to secure and preserve an impartial jury. Id.

VII.
We next consider defendants' challenges to several of the trial court's evidentiary decisions. Based upon our thorough review of the record, we find no error capable of producing an unjust result.
Initially, we are entirely satisfied that evidence of William's prior mistreatment of Xiomara was properly admitted. Evidence that a person committed a past crime or prior wrong is inadmissible to establish a defendant's disposition to commit *373 the offense for which he or she is currently being charged. Evid.R. 55; see also State v. Kociolek, 23 N.J. 400, 419, 129 A.2d 417 (1957); State v. Wilson, 158 N.J. Super. 1, 5, 385 A.2d 304 (App.Div. 1978), certif. den. 79 N.J. 473, 401 A.2d 229 (1978). The rule excluding "other crime" evidence is not grounded upon the absence of probative value attributable to such proof. Indeed, it has been said that "such evidence is extremely compelling, particularly when the prior offense is of recent vintage." State v. Humphrey, 183 N.J. Super. 580, 585, 444 A.2d 1135 (Law Div. 1982), aff'd 209 N.J. Super. 152, 507 A.2d 241 (App.Div. 1986). Rather, the rule "seeks to guard a defendant's right to a fair trial by avoiding the danger that a jury might convict the accused simply because the jurors perceive him to be a `bad person.'" State v. Ramseur, 106 N.J. at 265, 524 A.2d 188; see also State v. Sempsey, 141 N.J. Super. 317, 322-323, 358 A.2d 212 (App.Div. 1976), certif. den. 74 N.J. 273, 377 A.2d 677 (1977). The danger is that it "may weigh too heavily with a jury" and deny the accused a fair opportunity to defend himself against a particular charge. State v. Soney, 177 N.J. Super. 47, 59, 424 A.2d 1182 (App.Div. 1980), certif. den. 87 N.J. 313, 434 A.2d 67 (1981); State v. Miller, 159 N.J. Super. 552, 562, 388 A.2d 993 (App.Div. 1978). Thus, even where evidence of prior crimes is relevant to one or more of the issues in the case, the trial court must embark upon a delicate weighing process, balancing the probative value of such proof with its prejudicial effect. State v. Ramseur, 106 N.J. at 265, 524 A.2d 188; see also State v. Carter, 91 N.J. 86, 106, 449 A.2d 1280 (1982); State v. Atkins, 78 N.J. 454, 462, 396 A.2d 1122 (1979); State v. King, 215 N.J. Super. 504, 520, 522 A.2d 455 (App.Div. 1987); State v. Coruzzi, 189 N.J. Super. 273, 302, 460 A.2d 120 (App.Div. 1983), certif. den. 94 N.J. 531, 468 A.2d 185 (1983).
We are convinced that evidence of William's prior acts of violence and threats against Xiomara was highly relevant with respect to the issue of motive and that its probative value far outweighed its potential for undue prejudice. We note that evidence of arguments or violence between a defendant and a *374 homicide victim has long been admitted. See, e.g., State v. Ramseur, 106 N.J. at 267, 524 A.2d 188; State v. Mulero, 51 N.J. 224, 228-229, 238 A.2d 682 (1968); State v. Lederman, 112 N.J.L. 366, 372, 170 A. 652 (E. & A. 1934); State v. Schuyler, 75 N.J.L. 487, 488, 68 A. 56 (E. & A. 1907); State v. Donohue, 2 N.J. 381, 388, 67 A.2d 152 (1949); State v. Slobodian, 120 N.J. Super. 68, 75, 293 A.2d 399 (App.Div. 1972), certif. den. 62 N.J. 77, 299 A.2d 75 (1972). The trial court's admission of this evidence was thus in accord with settled case law. Moreover, William's violent acts and threats were in close temporal proximity to the killing and disclosed an enduring hostility toward the victim. State v. Ramseur, 106 N.J. at 266, 524 A.2d 188. Here, evidence of motive was "important and material." State v. Rogers, 19 N.J. 218, 228, 116 A.2d 37 (1955). Without such evidence, there would have been "no means to reach and disclose" William's secret design and purpose. Id. Further, the court's carefully worded and emphatic instruction limiting the jury's consideration of the evidence to the question of motive obviated any potential for undue prejudice. State v. Stevens, 115 N.J. 289, 304, 558 A.2d 833 (1989); Evid.R. 6.
Xiomara's mother testified that she immediately suspected William's involvement in her daughter's disappearance. William asserts that he was deprived of a fair trial by reason of this brief comment. While perhaps this remark would have been better left unsaid, we discern no reason to reverse on that account. The witness's conclusory remark did not have the capacity to sway the jury.
There is no merit in Herbert's contention that the trial court erred by permitting McFadden to testify he, Herbert, showed him a gun during the planning of the murder. Defense counsel did not interpose an objection, signifying that in the atmosphere of the trial he did not believe his client was prejudiced by this testimony. Cf. State v. Marks, 201 N.J. Super. 514, 534, 493 A.2d 596 (App.Div. 1985), certif. den. 102 N.J. 393, 508 A.2d 253 (1986). In fact, defense counsel exhaustively cross-examined *375 McFadden on this point, noting that his trial testimony was inconsistent with his prior statements.
Equally unpersuasive is defendants' argument that they were improperly curtailed in cross-examining McFadden concerning his interest in the outcome of the case. The trial court precluded counsel from questioning McFadden concerning the possibility of executive clemency. While we recognize that a witness's interest or bias is an appropriate subject of inquiry, see State v. Zwillman, 112 N.J. Super. 6, 18, 270 A.2d 284 (App.Div. 1970), certif. den. 57 N.J. 603, 274 A.2d 56 (1971), a cross-examiner does not have a license to roam at will under the guise of impeaching credibility. State v. Pontery, 19 N.J. 457, 473, 117 A.2d 473 (1955). A trial judge has broad discretion to determine the proper limits of cross-examination of a witness whose credibility is put in issue. Ibid.
We perceive no abuse of the trial court's discretionary power here. Counsel were permitted to cross-examine McFadden extensively with respect to his criminal exposure and the terms of the plea-agreement. The jury was made aware of the fact that McFadden had initially faced the death penalty, but was promised no more than a life term on the murder conviction and a concurrent sentence on the other charge. Defense counsel called to the jury's attention the fact that no charges had been filed against McFadden in South Carolina for disposal of the victim's body and automobile. So too, the jury was aware of the fact that no federal charges were filed concerning transporting the victim's body across state lines. Defense counsel's thorough cross-examination of McFadden fully disclosed the reason for his testimony and his interest in the case. See State v. Taylor, 49 N.J. 440, 447-449, 231 A.2d 212 (1967); State v. Vaccaro, 142 N.J. Super. 167, 176-177, 361 A.2d 47 (App.Div. 1976), certif. den. 71 N.J. 518, 366 A.2d 674 (1976). The trial court's restrictions on the scope of this inquiry were minimal and appropriate.
*376 Defendants contend that McFadden's testimony he was to serve his sentence in a "separate institution" portrayed them as dangerous and violent persons and thereby deprived them of a fair trial. We disagree. We note that McFadden's comment was unsolicited by the prosecutor and unresponsive to the question propounded. The prosecutor was attempting to elicit testimony that McFadden's sentence on the conspiracy count was to run concurrently with that of his murder conviction. Clearly, McFadden misunderstood the prosecutor's question. In any event, the record reveals that, after a brief side-bar discussion, the prosecutor went on to another subject. No further mention was made of the particular institution in which McFadden was to serve his sentences. In light of the extensive record, we are convinced that McFadden's isolated and fleeting allusion played no part in the jury's consideration of the case.
We find no error in the admission of Dr. Platt's testimony. Although ambiguously phrased, defendants apparently contend that Platt should not have been permitted to testify in light of his close personal association with the victim's family. Defendants cite no authority for this contention and we have found none. Platt's relationship with the victim's family was made known to the jury for the purpose of affecting his credibility. It was not a reason for disqualifying him as a witness.
Finally, defendants contend that the trial court abused its discretion by admitting a photograph of the victim taken prior to her death. Apparently, the State introduced the photograph to show Xiomara's physical beauty, perhaps the reason for William's obsession with her. The photograph was marginally relevant for this purpose. See State v. Kersting, 50 Or. App. 461, 623 P.2d 1095 (1981), aff'd 292 Or. 350, 638 P.2d 1145 (1982). In any event, we find no prejudice flowing from admission of the photograph.

*377 VIII.
Defendants next argue that the prosecutor exceeded the bounds of fair comment in his summation. More specifically, defendants contend that the prosecutor improperly (1) expressed his opinion as to their guilt and vouched for the strength of the State's case, (2) appealed to class prejudice, (3) denigrated the defense, (4) commented on matters outside of the evidence, (5) alluded to their right not to testify, and (6) suggested that the jury would not fulfill its duty unless it returned a verdict of guilty. A plethora of grievances is advanced in support of these general contentions. We will not discuss each claim of error in detail. Suffice it to say, we find that none of the derelictions cited, viewed singly or in their cumulative effect, had the capacity to deprive defendants of a fair trial.
At the outset, we stress that defendants failed to interpose an objection to any of the comments they now claim constituted reversible error. Their arguments must thus be considered in the context of the plain error doctrine. R. 1:7-2; R. 2:10-2. It is fundamental in our practice that a claim of error which could have been but was not raised at trial will not be dealt with as would be a timely challenge. The reasons are several. As we pointed out in our prior discussion of defendant's evidentiary arguments, "[i]t may be fair to infer from the failure to object below that in the context of the trial the error was actually of no moment." State v. Macon, 57 N.J. 325, 333, 273 A.2d 1 (1971). Moreover, "to rerun a trial when the error could easily have been cured on request, would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal." Ibid. We are wholly unpersuaded by defendants' present claim that they did not interpose timely objections because they were concerned that such a course would leave the jury with an unfavorable impression. We do not deem it a palliative to explore trial counsel's thought processes. We merely note that at other points in the trial defense counsel *378 were not reticent in raising objections and presenting their views. We are satisfied from our reading of the record that defendants were offered every opportunity for a fair trial and that their failure to object was predicated upon their view that either error was not committed or, if it was, then it was inconsequential.
We first reject defendants' claim that the prosecutor expressed his opinion on the issue of guilt. It is well settled that a prosecutor during his summation may not express his personal belief with respect to the guilt of the accused. State v. Spano, 64 N.J. 566, 568, 319 A.2d 217 (1974); State v. Farrell, 61 N.J. 99, 103, 293 A.2d 176 (1972); State v. Hipplewith, 33 N.J. 300, 312, 164 A.2d 481 (1960). It is likewise improper for a prosecutor to state that he would not prosecute if he did not believe the defendant to be guilty if the import is or may be that his belief is based upon facts not before the jury. Aponte v. State, 30 N.J. 441, 447, 153 A.2d 665 (1959); State v. Butler, 27 N.J. 560, 607, 143 A.2d 530 (1958). The reason for the rule is plain. In the minds of jurors, "such statements may add the weight of the prosecutor's official and personal influence and knowledge to the probative force of the evidence adduced, thus creating the possibility that the jurors consciously or unconsciously might adopt the prosecutor's view without applying their own independent judgment to the evidence." State v. Thornton, 38 N.J. 380, 398, 185 A.2d 9 (1962), cert. den. 374 U.S. 816, 83 S.Ct. 1710, 10 L.Ed.2d 1039 (1963). Thus, a prosecutor may not inform the jury that he never "felt stronger about a case," State v. Farrell, 61 N.J. at 103, 293 A.2d 176, or that "many of the things we developed, we can't bring in here as evidence," State v. Anderson, 35 N.J. 472, 494, 173 A.2d 377 (1961), or that "I am convinced that this man is guilty," State v. Hipplewith, 33 N.J. at 311, 164 A.2d 481, or that if the case was a "loser," he would try some other means to "get out of [it]," Aponte v. State, 30 N.J. at 447, 153 A.2d 665. Derelictions in this regard have been subject to the *379 severest kind of censure. State v. Thornton, 38 N.J. at 399, 185 A.2d 9.
However, that is not what occurred here. Defendants claim that the prosecutor impliedly expressed his view of their guilt by saying that he would not "breach [his] oath" in an attempt to win a case. However, that is not what the prosecutor said. Rather, the prosecutor merely noted that he had complied with discovery rules by disclosing Pee Wee Wright's criminal record and that a failure to abide by that obligation would constitute a "breach of [his] office." In a similar vein, the prosecutor did not say, as defendants suggest, that the police and investigators, by reason of their office, would never commit perjury or further a falsehood. Instead, he merely defended the integrity of the investigation by alluding to their lack of interest in the case. These comments, although forcefully put, were in response to defense counsel's lengthy summation in which they characterized the State's case as a "big lie," "a disgrace," "an outrage." The entire thrust of defense counsel's attack was that the State was attempting to "frame" the defendants. In reviewing the State's response, we "must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo." United States v. Young, 470 U.S. 1, 12, 105 S.Ct. 1038, 1045, 84 L.Ed.2d 1, 11 (1985). In that context, the prosecutor's remarks did no more than respond substantially in order to "right the scale." Id. at 13, 105 S.Ct. at 1045, 84 L.Ed.2d at 11. While we do not endorse the prosecutor's allusion to his investigators as "good men who leave their family [and] work day and night" and who would not "jeopardize their careers" over the Engels, the issue is not the State's license to make improper arguments, but whether the prosecutor's invited response, taken in context, unfairly prejudiced defendants. Id. at 12, 105 S.Ct. at 1044-1045, 84 L.Ed.2d at 10-11. We are convinced that it did not.
We also find no basis for defendants' argument that the prosecutor appealed to class prejudice. Again, the prosecutor's *380 statements concerning William's wealth must be considered in the context of the summations of both defense attorneys. Pointing to defendants' substantial resources, defense counsel rhetorically queried the jury "why in the world [would they] risk everything." They also questioned why men "hav[ing] so much money" who lived the "American dream" would hire an incompetent "hitman" such as McFadden. The prosecutor's reference to William as "a successful businessman" who "lived the American dream" had no capacity for undue prejudice and constituted an appropriate response to defense counsel's remarks. So too, the prosecutor's comments relating to the difference between William's and Xiomara's economic status were not designed to highlight class differences, but rather to counter William's statement to the police that he "always gave Xiomara more than he had," and that he wished to "remarry her." The prosecutor's remarks merely highlighted William's animus toward his former wife, his obsession with her alleged promiscuity and his distrust, hostility and hatred of her. These comments were entirely appropriate and based on the evidence.
Defendants' contention that the prosecutor improperly denigrated the defense and the role of defense counsel is also without merit. As we pointed out previously, the summations of both defendants' attorneys were replete with statements and innuendos that the prosecutor and his staff were attempting to "frame" the Engels. Defense counsel repeatedly ridiculed the prosecutor's investigators. Their references to "Inspector Cluseau [sic]" and other personages of similar renown were clearly designed to challenge the competency of the prosecution. In response, the prosecutor referred to counsel's "cute phrases" and "flip comments" in an attempt to direct the jury's attention to the "facts in the case." Although the prosecutor's remarks were undoubtedly "graphic[]" and "forceful[]," see State v. Johnson, 31 N.J. 489, 510, 158 A.2d 11 (1960), we perceive no dereliction warranting a reversal. It would be unreasonable to expect the State to present its case "in a manner appropriate to *381 a lecture hall." Id. at 511, 158 A.2d 11. Instead, we recognize that a criminal trial is "a swiftly moving dramatic contest which often evokes strong emotions in the participants." State v. Bucanis, 26 N.J. 45, 56, 138 A.2d 739 (1958), cert. den. 357 U.S. 910, 78 S.Ct. 1157, 2 L.Ed.2d 1160 (1958). In that context, we regard the prosecutor's comments as nothing more than a forceful response to defense counsel's colorful and highly dramatic appeals.
Equally unavailing is defendant's contention that the prosecutor referred to matters outside the record. We do not construe the prosecutor's remarks as an attempt to "divine the psychology of Xiomara's murderer," as defendants suggest. Although the prosecutor made repeated references to William's "need to control, dominate and possess Xiomara," these comments were based on the evidence.
Nevertheless, we recognize that several of the prosecutor's factual assertions were inaccurate. For example, he referred to the discovery of Xiomara's "nude body." So too, his response to Pee Wee Wright's presence in South Carolina with a "white woman's body" would have been better left unsaid. However, these isolated instances must be considered in the context of the entire trial proceedings, and so viewed, did not have the capacity to produce an unjust result.
Contrary to defendants' assertion, we do not find in the prosecutor's remarks a studied attempt to comment on their election not to testify. Nevertheless, we deplore the prosecutor's comment that the jury might wish to "ask" defendant why he would kill his former wife. Our Supreme Court has repeatedly criticized prosecutorial derelictions of this kind, noting that it is improper for a prosecutor to remark that the defense has offered "no explanation," State v. Gosser, 50 N.J. 438, 452, 236 A.2d 377 (1967), cert. den. 390 U.S. 1035, 88 S.Ct. 1434, 20 L.Ed.2d 295 (1968), that the State's evidence was "uncontradicted," State v. Sinclair, 49 N.J. 525, 549, 231 A.2d 565 (1967), that "defendant only can give us certain answers," State v. *382 Pickles, 46 N.J. 542, 579, 218 A.2d 609 (1966), that defendants refused to "[t]ake a lie detector test," State v. Driver, 38 N.J. 255, 260, 183 A.2d 655 (1962), and that defendant failed to "produce character witnesses," State v. Welsch, 29 N.J. 152, 158, 148 A.2d 313 (1959). We too have denounced comments of similar import, such as "[t]here hasn't been one scintilla of evidence on behalf of the defendant to contradict" the State's proofs. State v. McElroy, 96 N.J. Super. 582, 584, 233 A.2d 677 (App.Div. 1967), "[n]ormally, we have two sides to a story [but] [h]ere we have one side," State v. Persiano, 91 N.J. Super. 299, 301, 220 A.2d 116 (App.Div. 1966), and "[w]hat does [the defendant] have to hide," State v. Ferrell, 29 N.J. Super. 183, 186, 102 A.2d 70 (App.Div. 1954). These citations are by no means complete. We cite these decisions merely to caution against comments by prosecutors which may adversely affect an accused's Fifth Amendment rights. A prosecutor should not either in subtle or obvious fashion draw attention to a defendant's failure to testify. Remarks which "skirt the edges" of impermissible comment are neither desirable nor worth the risk of reversal of what may be a well-deserved conviction. State v. Dent, 51 N.J. 428, 442, 241 A.2d 833 (1968).
While we do not condone the prosecutor's comment, we are convinced that defendants were not deprived of a fair trial on that account. The prosecutor's misconduct must be viewed in the context of a protracted trial. State v. Ramseur, 106 N.J. at 323, 524 A.2d 188. Viewing the summation as a whole, we cannot fairly say that the prosecutor's errant remark was so egregious as to deny defendants a fair trial. See State v. Kelly, 97 N.J. 178, 218, 478 A.2d 364 (1984); State v. Tirone, 64 N.J. 222, 229, 314 A.2d 601 (1974); State v. Bucanis, 26 N.J. at 56, 138 A.2d 739. Moreover, the trial court's charge to the jury that statements made by the attorneys were not to be considered as evidence obviated any lingering potential for undue prejudice. See State v. Ramseur, 106 N.J. at 323, 524 A.2d 188; State v. Meneses, 219 N.J. Super. 483, 489, 530 A.2d 824 (App.Div. 1987), certif. den. 110 N.J. 156, 540 A.2d 160 (1988).
*383 Defendants' final contention is that the prosecutor improperly suggested to the jury it was its responsibility to return a verdict of guilty. We find no basis in the record for this contention. Throughout the prosecutor's summation, he emphasized the jury's role as the final arbiter of the facts. The thrust of the prosecutor's remarks was that the jury would perform its duty if it fairly considered the evidence. We are satisfied that the prosecutor did not stray beyond the bounds of fair comment.

IX.
We reject defendants' argument that the jury's verdict was the result of compromise and confusion. Defendants' contention is predicated upon the fact that after 17 hours of deliberations at the guilt phase, the jury sent a message to the judge indicating that it was "approaching a verdict" and requesting to be "rebriefed" on "aggravating" and "mitigating" factors. The judge responded by instructing the jury regarding the bifurcated proceedings and apprising it of its duty to confine its deliberations to the question of guilt or innocence. Defendants' motion for a mistrial was denied. Defendants argue, as they did below, that the jury compromised the issue of guilt in exchange for a commitment that the death penalty would not be imposed.
We find no basis for this argument. Jurors are not skilled in legal techniques. State v. Christener, 71 N.J. 55, 73, 362 A.2d 1153 (1976). While the note supports the thesis that the jurors were initially somewhat confused respecting the demarcation between the guilt and sentencing phases of the trial, the court's emphatic and thorough instructions plainly cured the problem. Defendants' argument to the contrary is based on pure speculation and conjecture.

X.
Defendants' contention that the verdict was against the weight of the evidence is clearly without merit and does not *384 require extended discussion. R. 2:11-3(e)(2). It does not "clearly and convincingly" appear that a manifest denial of justice resulted. State v. Carter, 91 N.J. at 96, 449 A.2d 1280; State v. Sims, 65 N.J. 359, 373-374, 322 A.2d 809 (1974); R. 2:10-1. The evidence abounds the other way. Defendants' first motion for a new trial, which advanced the claim of evidential insufficiency, was properly denied. Dolson v. Anastasia, 55 N.J. 2, 7, 258 A.2d 706 (1969).

XI.
In July 1987 McFadden filed a petition for post-conviction relief in which he recanted his trial testimony. In a handwritten note to the trial judge, McFadden stated that he and Pee Wee Wright attempted to burglarize Kassa, but fled when the burglar alarm sounded. McFadden related that in their attempt to escape they came upon Xiomara who was seated in her car. According to the recantation, after striking Xiomara with a rock, McFadden, with Wright's assistance, stole the victim's automobile and left for South Carolina.
On August 7, 1987, McFadden, represented by counsel, repudiated his recantation under oath. Specifically, he stated that while incarcerated in Trenton State Prison's Vroom Building he had been approached by another prisoner who suggested that he recant his trial testimony. Shortly thereafter, McFadden met the prisoner in the library and was advised that he, the prisoner, would prepare an account of the killing which McFadden was to rewrite in his own handwriting. McFadden agreed, allegedly because he feared "something [would] happen to [him] in the yard." The prisoner then prepared a post-conviction relief petition which McFadden copied and sent to the court. When the prisoner subsequently learned that McFadden had met with the Bergen County Prosecutor, he inquired as to the amount McFadden had received for the killing, suggesting that he could "probably arrange the balance of $19,000 to be transferred through [McFadden's] family." McFadden noted, *385 however, that neither he nor any member of his family actually received the $19,000.
A hearing on defendants' motion for a new trial was conducted on December 3, 1987. McFadden's testimony mirrored the account he had given in his letter of August 7, repudiating his recantation. McFadden testified that his recantation was a "lie" and that he "went along" with the scheme because he feared for his safety in prison. At the hearing, the trial judge barred defense counsel from presenting medical evidence purportedly supporting the truthfulness of McFadden's recantation.
The judge denied defendant's request for a new trial. Initially, the judge determined that the medical testimony defendants sought to introduce at the hearing was not "newly discovered," noting that the report was similar to that of another expert defendants had retained prior to trial, but whose testimony was never presented. The judge also found that McFadden's recantation was wholly incredible, particularly viewed in the context of his later repudiation, and was not a sufficient basis for a new trial.
Defendants now contend that McFadden's recantation disclosed the falsity of his trial testimony and required vitiation of the jury's verdict. They also argue that the judge erred by precluding them from presenting medical evidence bolstering McFadden's recantation. Lastly, they contend that the judge abused his discretion by refusing to reopen the hearing when he learned that this court had remanded McFadden's sentence for reconsideration. We find no merit in these arguments.
Our courts have long recognized that recantations by prisoners are "not uncommon" and that "[i]t would be unwise to vest in a State's witness the effective power thereby to grant a new trial." State v. Baldwin, 47 N.J. 379, 400, 221 A.2d 199 (1966), cert. den. 385 U.S. 980, 87 S.Ct. 527, 17 L.Ed.2d 442 (1966). See also State v. Carter, 69 N.J. 420, 427, 354 A.2d 627 (1976); State v. Sullivan, 43 N.J. 209, 232-233, 203 A.2d 177 *386 (1964), cert. den. 382 U.S. 990, 86 S.Ct. 564, 15 L.Ed.2d 477 (1966); State v. Artis, 36 N.J. 538, 541, 178 A.2d 198 (1962); State v. Vaszorich, 13 N.J. 99, 130, 98 A.2d 299 (1953), cert. den. 346 U.S. 900, 74 S.Ct. 219, 98 L.Ed. 400 (1953). Prisoners often have nothing to lose and much to gain by repudiating their trial testimony. For that reason, we regard recantations as inherently suspect.
Our rules reflect this distrust for prisoners' attempts to nullify their prior accounts of criminal activity. The issue for the trial court upon the application for a new trial "is not whether the new story, had it been available at trial, would have impugned the credibility of the witness...." State v. Baldwin, 47 N.J. at 400, 221 A.2d 199. Obviously, a new and different version under oath would necessarily raise questions concerning the credibility of the witness's trial testimony. The appropriate test is "whether the testimony given at the trial was probably false" and whether "on that account there is a substantial possibility of [a] miscarriage of justice." Ibid. The trial judge is thus obliged to consider "where the truth probably lies." Ibid. If the judge is satisfied that the present testimony of the recanting witness is untrue, the application must be denied. Ibid. See also State v. Puchalski, 45 N.J. 97, 107-108, 211 A.2d 370 (1965). In making this determination, the credibility of recantation testimony is peculiarly a question for the trial judge who sees the witnesses, hears their testimony and has the feel of the case. State v. Smith, 29 N.J. 561, 573, 150 A.2d 769 (1959), cert. den. 361 U.S. 861, 80 S.Ct. 120, 4 L.Ed.2d 103 (1959). We add that because a reviewing court does not enjoy that advantage it should defer to the trial judge's findings on this sensitive issue. State v. Carter, 69 N.J. at 427-428, 354 A.2d 627.
In this case, we have the benefit of the detailed findings of the judge who presided over the lengthy trial and the hearing on defendants' motion. He found that the recantation was patently untrue and unbelievable. The record submitted to us *387 fully supports the judge's view, particularly in light of McFadden's repudiation of his recantation.
We discern no sound basis to disturb the judge's decision barring defense counsel from presenting independent evidence bolstering McFadden's recantation. This evidence was not newly discovered. While we do not suggest that evidence supporting the credibility of a witness's recantation testimony can never be presented at a motion for a new trial, we perceive no abuse of the judge's discretion here.
Finally, the judge did not mistakenly exercise his discretion in refusing to reopen the hearing. Apparently, another panel of this court heard McFadden's sentencing appeal just two days prior to the hearing on defendants' motion for a new trial. Defendants contend that McFadden's repudiation of his recantation was perhaps an attempt to curry favor with the State. They point out that this court remanded McFadden's case for resentencing shortly after the hearing. However, there is no reason to believe that McFadden was aware of the status of his appeal when he testified at the hearing on the motion for a new trial. Moreover, our remand order had nothing to do with the merits of the sentence imposed. Instead, it was predicated upon the judge's apparent misunderstanding that a life sentence was mandatory. Beyond this, we stress that counsel's cross-examination of McFadden, both at the trial and at the hearing on the motion, was excruciatingly exhaustive. We discern no abuse of the judge's discretionary powers.

XII.
Defendants' final contention is that the Law Division erred by denying their third motion for a new trial. In March 1989, we granted defendants' motion for a limited remand to pursue an application for a new trial based on newly discovered evidence. The evidence consisted of x-rays of the victim's head. They disclosed a radio-opaque object within the victim's skull. Defendants claimed that the prosecutor had this evidence in his *388 possession prior to trial, but failed to disclose the x-rays in discovery despite the defense's specific request for all medical records and documents pertaining to the decedent. Defendants also contended that the prosecutor deliberately hid the x-rays from Dr. DiCostanzo, thereby purposely causing him to testify falsely concerning the cause of death. Based upon documentary submissions, the Law Division found that the x-rays were neither exculpatory nor material and would not have had any impact on the jury's decision had they been presented at trial. The judge also determined that although the prosecutor was aware of the existence of the x-rays he could not be charged with knowledge they revealed a radio-opaque object in the victim's skull. The judge thus concluded that the prosecutor had not deliberately caused Dr. DiCostanzo to testify falsely.
Defendants argue that the Law Division judge improperly denied them an evidentiary hearing. They also assert that the prosecutor wrongfully suppressed exculpatory evidence and deliberately elicited false testimony. Alternatively, defendants contend that the newly discovered evidence was material to the issue, not discoverable by reasonable diligence prior to trial, and was of the sort that would probably change the jury's verdict if a new trial were granted.
At this juncture, our concern is whether a new trial is warranted on either of the two related grounds urged by defendants. The first inquiry is whether the prosecution withheld material evidence favorable to the defendants, thereby violating the rule developed in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. See United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Cf. Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). If not, there nevertheless remains the question whether the x-rays are such as to satisfy the test for a retrial based on *389 newly discovered evidence. State v. Carter, 85 N.J. 300, 311, 426 A.2d 501 (1981).

A.
We begin by tracing the evolution of constitutional principles pertaining to prosecutorial withholding of material, favorable evidence. This brief overview is necessary for a complete understanding of the issues presented.
In Brady v. Maryland, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused [which has been requested in pretrial discovery] violates due process where [it] is material either to guilt or to punishment, irrespective of the good faith or bad faith of the [State]." 373 U.S. at 87, 83 S.Ct. at 1196-1197, 10 L.Ed.2d at 218. In order to establish a Brady violation the defense must demonstrate that (1) the prosecution failed to disclose the evidence, (2) the evidence was of a favorable character for the defense, and (3) the evidence was material. See Moore v. Illinois, 408 U.S. at 794-795, 92 S.Ct. at 2568, 33 L.Ed.2d at 713.
Although this principle can be stated with disarming ease, its application over the years has generated troubling questions concerning the impact of prosecutorial suppression on the defense. Because of the many kinds of evidence that can be considered favorable to a defendant, the Supreme Court developed different rules concerning the standard of materiality for determining whether a Brady violation required a new trial. State v. Carter, 85 N.J. at 311-312, 426 A.2d 501. In making the often difficult determination of what is "material," the Court "look[ed] to the factual circumstances of the particular case." State v. Carter, 91 N.J. at 112, 449 A.2d 1280. Three general factual settings were considered, resulting in different definitions of materiality. First, where the prosecution knowingly uses perjured testimony, the Court has held that the conviction will be set aside if there is a "reasonable likelihood *390 that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. at 103, 96 S.Ct. at 2397, 49 L.Ed.2d at 349-350. The second situation, illustrated by the facts in Brady, is one in which the defense has made a specific request for the withheld evidence. The Court has determined that the conviction must be vacated if the suppressed evidence might have affected the outcome of the trial. 427 U.S. at 104, 96 S.Ct. at 2397, 49 L.Ed.2d at 350. The third variation is found where the defense has made no request, or only a general one, for the undisclosed material. In that setting, a reversal has been said to be required if the "omitted evidence creates a reasonable doubt that did not otherwise exist." Id. at 112, 96 S.Ct. at 2402, 49 L.Ed.2d at 355.
However, the United States Supreme Court recently revisited this area and, at least to some extent, abrogated these rules. In United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Court held that the standard set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), was "sufficiently flexible to cover the `no request,' `general request,' and `specific request' cases of prosecutorial failure to disclose evidence favorable to the accused." 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494. Under that formulation, the materials suppressed by the prosecution are considered material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Ibid. The Court added that a "`reasonable probability' is a probability sufficient to undermine confidence in the outcome." Ibid.
Unfortunately, the Court's opinion in Bagley is not entirely clear respecting whether the Strickland test is to be applied to cases in which the prosecution has knowingly used perjured testimony. As we noted previously, the United States Supreme Court had traditionally applied a more lenient standard for reversal in factual settings involving the knowing use of perjured testimony by the prosecutor. The rule that a conviction obtained by the knowing use of perjured testimony must be set *391 aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict derived from Napue v. Illinois, 360 U.S. at 269, 79 S.Ct. at 1177, 3 L.Ed.2d at 1221. As mentioned in Bagley, the Court's opinion in Napue antedated Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), where the "harmless error beyond a reasonable doubt" standard was established. 473 U.S. at 679 n. 9, 105 S.Ct. at 3382 n. 9, 87 L.Ed.2d at 492 n. 9. The Court in Chapman said there was little, if any, difference between a rule formulated, as in Napue, in terms of "`whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction,'" and a rule "requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710. Synthesizing these decisions, the Court in Bagley stated that its "precedents indicate that the standard of review applicable to the knowing use of perjured testimony is equivalent to the Chapman harmless-error standard." 473 U.S. at 679 n. 9, 105 S.Ct. at 3382 n. 9, 87 L.Ed.2d at 492 n. 9.
Until recently, New Jersey cases dealing with prosecutorial suppression of exculpatory evidence mirrored federal precedents. In State v. Carter, 85 N.J. at 312, 426 A.2d 501, our Supreme Court adopted the "sliding scale" analysis originally enunciated by the United States Supreme Court in Agurs. Materiality of the suppressed evidence was said to depend upon whether and to what extent the defense requested pretrial disclosure. Id. at 311-312, 426 A.2d 501. In its later opinion in the same case, the Court added that where there has been a specific request for concealed materials the "might have affected the outcome of the trial" test was "synonymous with harmless error." State v. Carter, 91 N.J. at 113, 449 A.2d 1280. In such cases, the Court said that the materiality of the suppressed evidence hinged upon whether the prosecutorial dereliction was "harmless beyond a reasonable doubt." Ibid.
*392 When this appeal was first briefed and argued, two questions were raised. The first was whether New Jersey should adopt the Bagley analysis and apply the Strickland standard whether the defense made a specific or general request, or no request at all, for the evidence suppressed by the prosecution. The second was whether a more lenient reversal standard should be applied in that narrow category of cases where the claim is made that the prosecutor deliberately elicited perjured testimony.
The first question was at least partially answered by our Supreme Court's recent decision in State v. Marshall. There, the Court "decline[d] to accept the State's suggestion that we adopt a standard of materiality enunciated in [Bagley]." 123 N.J. at 200, 586 A.2d 85. Instead, the Court retained the "harmless constitutional error" criterion, at least where the "defendant has made a specific request for the nondisclosed information...." Id. at 199, 586 A.2d 85. Although Justice Stein's majority opinion is not altogether clear on the point, we assume that the Court intended to retain the "sliding scale" analysis originally developed in Agurs, but later eschewed by the United States Supreme Court in Bagley. That being the case, we must determine whether the defense's discovery request was "general" or "specific." If the request was "general," as the State contends, the conviction must be reversed and a new trial ordered only if the "omitted evidence creates a reasonable doubt that did not otherwise exist." United States v. Agurs, 427 U.S. at 112, 96 S.Ct. at 2403, 49 L.Ed.2d at 355. If the request was "specific," as defendants argue, the "might have affected the outcome of the trial" standard is to be utilized, 427 U.S. at 104, 96 S.Ct. at 2397, 49 L.Ed.2d at 350 and, as stated in State v. Carter, 91 N.J. at 113, 449 A.2d 1280, we must determine whether the prosecutor's dereliction was harmless beyond a reasonable doubt.
We embark upon this inquiry against the backdrop of our longstanding policy requiring the prosecutor to provide the defense with complete pretrial discovery. It is arguable that *393 the "sliding scale" analysis is more appropriate to jurisdictions having less liberal discovery rules than this state. In New Jersey, our discovery rules represent a "modern embracement of broad [pretrial disclosure] as an aid to [advancing] truth and justice...." State v. Montague, 55 N.J. 387, 401, 262 A.2d 398 (1970). Although our rules of practice do not specifically say so, their import is, in effect, to make the prosecutor's entire file available to the defendant as a matter of right upon a general demand. See Report of the Supreme Court Committee on Criminal Procedures, 96 N.J.L.J. Index 459, 462 (1973); see also Pressler, Current N.J. Court Rules, Comment R. 3:13-3 (1991). This somewhat informal practice that has evolved over the years has served us well. It has tended to expedite the trial of criminal cases, freed the defense bar from the necessity of filing cumbersome and highly detailed pretrial discovery motions and adequately protected the rights of the accused.
We digress to make these observations because they are relevant in understanding defense counsel's conduct in this case. In no uncertain terms, the defense requested Xiomara's entire medical file. In retrospect, perhaps counsel's request should have been more specific. However, defense counsel's request was tailored to what they knew prior to trial and what they reasonably could expect from the prosecutor in light of New Jersey's long experience with liberal pretrial disclosure. Under these circumstances, we are of the view that defense counsel's request was sufficiently specific to put the prosecutor on notice of his responsibility to provide all medical documents and reports, including the x-rays at issue here. We are convinced that defense counsel's demand for pretrial discovery was specific enough to trigger the harmless constitutional error standard adopted in Carter. We must therefore determine whether the prosecutor's failure to provide the defense with the x-rays "was harmless beyond a reasonable doubt, namely whether there was a `reasonable possibility' that the error ... affected the result." State v. Carter, 91 N.J. at 113, 449 A.2d 1280.
*394 We do not regard the difference between the Strickland and Carter standards as a "splitting of hairs," as the State suggests. While Bagley and Strickland require a "reasonable probability" that the verdict would have been different, the harmless constitutional error standard, as interpreted by our Supreme Court in State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971), requires only a "real possibility" of injustice as the basis for a reversal. Although the two standards are different, we nevertheless agree with the State that no matter how the test is phrased, the question whether an error is reason for reversal depends finally upon some degree of possibility that it led to an unjust verdict. Id. at 335, 273 A.2d 1. The "might have affected the outcome of the trial" test "is not translatable into the mere possibility that the undisclosed information might have helped the defense." State v. Carter, 91 N.J. at 113, 449 A.2d 1280. Otherwise the test would call for automatic reversal. Ibid. Instead, "[t]here must be a real possibility that the evidence would have affected the result." Ibid. "The possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. at 336, 273 A.2d 1.
As to the second question, defendants assert that the most liberal reversal criterion should be applied where the prosecutor has knowingly elicited false or perjurious testimony. Defendants argue that deliberate prosecutorial misconduct is contrary to any concept of ordered liberty. Noting that the United States Supreme Court in Bagley has singled out this type of prosecutorial dereliction for special scrutiny, defendants claim that we should follow suit. It is suggested that reversal is required in such cases not merely to rectify a wrong already done, but also to deter future insolence in office.
We need not decide whether a more lenient standard of reversal is to govern cases involving the prosecution's knowing use of perjured testimony. The evolution of federal and state constitutional principles in that respect is perhaps not complete. *395 Because of this ambiguity, we remanded the matter for an evidentiary hearing on the specific issue whether the prosecutor was aware of the contents of the x-rays, i.e., that they revealed a radio-opaque object, and yet deliberately permitted Dr. DiCostanzo to testify falsely.
Pursuant to our remand order, an extensive evidentiary hearing was conducted and the Law Division judge made specific findings of fact on the subject. The judge determined that the prosecutor's office had possession of the x-rays but the prosecutor himself was not aware of the fact that they revealed a radio-opaque object embedded in the decedent's skull. Instead, the prosecutor relied on the autopsy report, as did Dr. DiCostanzo and the defense experts. The autopsy report, although making reference to the x-rays taken, said nothing indicating the presence of a radio-opaque object. The judge thus concluded that the prosecutor acted in good faith, did not deliberately mislead the defense, and did not purposely use perjured or false testimony. These findings and conclusions are supported by sufficient, credible evidence presented in the record. State v. Johnson, 42 N.J. 146, 199 A.2d 809 (1964).
At the remand hearing, evidence was presented indicating that Dr. Platt briefly examined the x-rays in the course of his autopsy of the victim. Dr. Platt testified that he placed the x-rays on a screen. The doctor did not recall noticing the presence of a radio-opaque object, but conceded that he "must have seen it." It is apparent that Dr. Platt ascribed no significance to the x-rays in determining the cause of death. However, defendants assert that Dr. Platt's knowledge of the contents of the x-rays should be imputed to the prosecutor for the purpose of determining whether the State deliberately presented perjured or false testimony. Defendants claim that the relevant entity for knowledge of the falsity of a State's witness's testimony is the entire prosecution team, which includes individuals involved at all stages of the investigation.
*396 There is substantial authority supporting the proposition that the knowledge of one member of a prosecutor's office is to be imputed to another in the context of a Brady violation. See, e.g., Mills v. Scully, 826 F.2d 1192, 1195 (2d Cir.1987); United States v. Antone, 603 F.2d 566, 570 (5th Cir.1979); United States v. Ruiz, 711 F. Supp. 145, 147 (S.D.N.Y. 1989), aff'd 894 F.2d 501 (2d Cir.1990); Buitrago v. Scully, 705 F. Supp. 952, 956 (S.D.N.Y. 1989); Graham v. Wilson, 645 F. Supp. 664, 672-673 (D.Colo. 1986), order vacated 828 F.2d 656 (10th Cir.1987), cert. den. 484 U.S. 1069, 108 S.Ct. 1035, 98 L.Ed.2d 999 (1988); Taylor v. Maggio, 581 F. Supp. 359, 362 (E.D.La. 1984); cf. Giglio v. United States, 405 U.S. at 153-154, 92 S.Ct. at 765-766, 31 L.Ed.2d at 108-109. These decisions hold that knowledge of the particular prosecutor trying the case is not required. See United States v. Ruiz, 711 F. Supp. at 147. "[I]t is sufficient if another government attorney knows about the false testimony and no steps are taken to correct it." Mills v. Scully, 826 F.2d at 1195. This principle has been extended to situations in which there has been extensive cooperation between different investigative agencies. See United States v. Antone, 603 F.2d at 570. In United States v. Antone, for example, a state agent's knowledge was imputed to the federal prosecutor where there had been substantial "interaction and cooperation between the two governments." Id.
This much conceded, we question whether Dr. Platt can fairly be considered a member of the prosecutor's team. It will be recalled that Dr. Platt's involvement in this case was at the behest of the victim's family. The victim's mother independently contacted Dr. Platt and requested that he perform a second autopsy. This was not part of his official duties. Under similar circumstances, the Supreme Court of Vermont has held that a physician contacted independently by a rape victim was not part of the prosecution team and his negligence in losing evidence could not be imputed to the State. State v. Smith, 145 Vt. 121, 485 A.2d 124, 128 (1984).
*397 We need not dwell upon the subject. Whatever else may be said, it is plain to us that the circumstances of this case are not so egregious as to compel application of a more rigorous standard of review than harmless constitutional error. We note that this was the standard applied in Giglio. The United States Supreme Court found that it was sufficiently protective of the defendant's rights. We thus apply the Carter harmless constitutional error test and leave for another day the question whether a different rule should govern a prosecutor's knowing use of perjured testimony.

B.
Defendants contend that the Law Division judge erred by failing to conduct an evidentiary hearing. In light of our remand order and the evidentiary hearing that followed, defendants' claim is now moot insofar as it relates to the issue of whether the prosecutor deliberately elicited perjured testimony. Defendants continue to argue, however, that regardless of the good faith of the prosecutor in presenting Dr. DiCostanzo as a witness, they should have been granted an evidentiary hearing on the related claim that their right to defend against the charges was seriously impaired by the failure of the State to disclose the x-rays. We reject this contention.
We emphasize that the affidavits and certification submitted by the defense and the prosecutor were in substantial agreement with respect to what had occurred. We note further that, with only one exception, the material factual issues raised were decided in favor of the defense and adversely to the prosecutor's position. The judge found as a fact that the "prosecution knew of the x-rays and had [them] in its possession." The judge further determined that a member of the prosecutor's office "received the x-rays on January 2, 1985," and that they were subsequently given "to the Medical Examiner's office for review." The judge expressly found that "the prosecution failed to affirmatively disclose the x-rays," that the expert *398 retained by the defense was not given them "at his autopsy," that "[t]hey were not produced for inspection" when defense counsel "personally examined all the physical and documentary evidence" at the Medical Examiner's office, and that the defense "was not specifically advised that skull x-rays were taken by the Charleston County Medical Examiner" or that "[they] were forwarded" to the Bergen County Prosecutor's office. It was also agreed that Dr. DiCostanzo "would have testified differently" had he known of the radio-opaque object, but his inconclusive opinion as to the cause of death would not have changed, that Dr. Platt's credibility would have been attacked with regard to his conclusion on the cause of death, and that defense counsel would have used the x-rays in cross-examining McFadden. In addition, had the defense been aware of the x-rays it might have presented expert testimony challenging the thesis that the victim died by strangulation. The only important factual dispute presented was whether or, to what extent, the prosecutor had knowledge of the contents of the x-rays. On that precise issue, however, we ordered a remand and an evidentiary hearing was conducted.
In short, an evidentiary hearing was not necessary respecting the defense's claim of prosecutorial suppression. See United States v. John Bernard Industries, Inc., 589 F.2d 1353, 1359 (8th Cir.1979); United States v. Herman, 614 F.2d 369, 372 (3d Cir.1980); United States v. Gilbert, 668 F.2d 94, 97 (2d Cir.1981), cert. den. 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982); State v. Conway, 193 N.J. Super. 133, 172-173, 472 A.2d 588 (App.Div. 1984), certif. den. 97 N.J. 650, 483 A.2d 174 (1984). With the exception of the action we have already taken, we find no error in the judge's refusal to conduct an evidentiary hearing.

C.
The Law Division judge determined that the x-rays were neither exculpatory nor material. We need not decide *399 whether the evidence was exculpatory. We note in passing, however, that at the least, the x-rays could have been used to impeach the credibility of Dr. Platt and McFadden. Impeachment evidence is generally considered "evidence favorable to an accused." Brady v. Maryland, 373 U.S. at 87, 83 S.Ct. at 1196, 10 L.Ed.2d at 218. "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as ... [credibility] ... that a defendant's life or liberty may depend." Napue v. Illinois, 360 U.S. at 269, 79 S.Ct. at 1177, 3 L.Ed.2d at 1221. For that reason, the United States Supreme Court has said that "nondisclosure of evidence affecting credibility falls within th[e] general rule of Brady." United States v. Bagley, 473 U.S. at 677, 105 S.Ct. at 3381, 87 L.Ed.2d at 490, quoting Giglio v. United States, 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108.
Having said this, we are nevertheless in complete agreement with the Law Division judge's conclusion that the x-rays were not material. We do not automatically require a new trial whenever "a combing of the prosecutors' files after [conviction] has disclosed evidence possibly useful to the defense...." Giglio v. United States, 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108. "A finding of materiality of the evidence is required under Brady." Ibid. Based upon our thorough review of the record, we are firmly convinced that the x-rays are not material and that there is no real possibility the result would have been different had the evidence been disclosed to the defense in a timely manner.
In making this determination, we recognize that the x-rays could have been used by the defense in a variety of ways. Dr. DiCostanzo would have alluded to the radio-opaque object in his testimony had he been aware of its existence. Specifically, he would have testified to the existence and significance of a radio-opaque object. He would have said that the object appeared to be metal, was denser in some areas than others and "could be some sort of projectile including either a missile or bullet." *400 The x-rays presented some evidence of possible trauma to the head. According to Dr. DiCostanzo's affidavit, he would have testified that the "break to the head" could have been caused by blunt trauma, and was less likely the result of internal combustion. He would have hypothesized that the missing piece of skull could have been separated from the body by reason of a trauma to the head. However, it is important to note that Dr. DiCostanzo's opinion as to the cause of death would not have been different. It will be recalled that the doctor testified at trial he was unable to reach a definite conclusion as to how the victim was killed. After having been apprised of the x-rays, the witness declined to say that they showed unequivocally that death was caused by trauma to the head.
We do not doubt that Dr. Platt's credibility would have been further challenged by use of the x-rays had they been available to the defense at the time of trial. Dr. Platt testified that the victim had died by strangulation. However, on cross-examination, Dr. Platt conceded that, since the top part of the victim's head was totally missing, certain definite conclusions could not be made because there was "no head" to examine. Beyond this, we note that defense counsel's cross-examination of Dr. Platt was exhaustive. The jury was well aware of his relationship with the victim's mother and his possible bias and interest in the case.
Had the x-rays been disclosed, they would have formed another avenue for impeaching McFadden's credibility. We stress, however, that the defense's cross-examination of McFadden took three days and occupied some 200 pages of the trial transcript. McFadden's credibility was severely and repeatedly assailed from every conceivable angle. McFadden was intensively questioned concerning discrepancies between his trial testimony and his written statements. The jury was made aware of all aspects of his plea agreement and of the favorable treatment he was given in exchange for his testimony. Based upon defense counsel's sustained efforts, it was crystal clear to *401 the jury that, in the past, McFadden had lied whenever he perceived an advantage in that avenue. In the face of all that the jury knew of the witness, it is inconceivable that the x-rays would have made a difference. Given the length and scope of the defense's attack on McFadden's direct testimony, there is no likelihood whatsoever that additional impeaching evidence would have affected the outcome of the trial. The x-rays would not have further undermined the witness's credibility.
Defendants claim that, had the x-rays been disclosed, they might have presented expert testimony, challenging the State's thesis that Xiomara died by strangulation. However, we emphasize that to this date, defendants have yet to provide a conclusive medical opinion that the x-rays demonstrate the cause of death to have been a blow to the head. The defense employed Dr. Frederick Zugibe, who re-autopsied the victim's body prior to trial, but chose not to reinterpret the x-rays. Instead, he relied on the readings of the South Carolina radiologist as "standard practice." Had the x-rays been made available to him, there is no reason to believe that he would have reviewed them himself or would have submitted them to a radiologist. Rather, he would have simply "accepted [the autopsy] report at face value." Even now, Dr. Zugibe says that, if given the chance to review specimens of the victim, along with the x-rays, he might be able to render a medical opinion that trauma to the head was the cause of death. According to Dr. Zugibe, the x-rays "may be indicative of further evidence of trauma to the head...." This highly equivocal statement must be viewed against the backdrop of the wealth of other evidence amassed against the defendants.
In sum, the existence of a radio-opaque object does not prove the head trauma theory. Nor does it point to defendants' innocence. There are always degrees of possibility. However, we are satisfied that the nondisclosure of the x-rays, in the face of all the other evidence, is not so adverse as to create a "real possibility" the result of the proceeding would have been different had the materials been produced. State v. Marshall, 123 *402 N.J. at 200, 586 A.2d 85. The x-rays do not in any sense undermine our confidence in the outcome of the trial. We recognize the difficulty of reconstructing the course that the defense and the trial would have taken had the evidence been made available to defendants. Nevertheless, we have attempted to consider and weigh "any adverse effect that the [nondisclosure] might have had on the preparation or presentation of the defendants' case." United States v. Bagley, 473 U.S. at 683, 105 S.Ct. at 3384, 87 L.Ed.2d at 494. In that context, we are fully satisfied that had the x-rays been disclosed by the State and used by the defense, the result would not have been different.

D.
We now shift our focus to a newly discovered evidence analysis. To qualify as newly discovered evidence, the new evidence must be (1) material to the issue and not merely cumulative or impeaching or contradictory, (2) discovered since the trial and not discoverable by reasonable diligence beforehand, and (3) of the sort that would "probably change the jury's verdict if a new trial were granted." State v. Carter, 85 N.J. at 314, 426 A.2d 501. All three prongs of this tripartite test must be met before the evidence can be said to justify a new trial. State v. Johnson, 34 N.J. 212, 223, 168 A.2d 1 (1961). We limit our review to the third standard, i.e., the evidence must be of a sort that would "probably change the jury's verdict." Defendants have failed to satisfy that test here.
We have previously characterized the trial record in this case as "fairly reek[ing] of defendants' guilt." A fair examination of the transcript admits of no other conclusion. Defendants' theory that Xiomara was killed in the course of a bungled burglary was rejected by the jury. The x-rays add little, if any, support to the defense's claim of innocence. We are entirely persuaded that a new trial is wholly unwarranted. *403 We find no sound basis to vitiate defendants' well deserved convictions.
Affirmed.