# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3862-22

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

A.B.,

      Defendant-Appellant.

_____

Submitted February 13, 2025 – Decided March 6, 2025

Before Judges Natali and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Indictment No. 22-04-0189.

Deininger & Associates, LLP, attorney for appellant (Christopher L. Deininger, of counsel and on the briefs).

Robert J. Carroll, Morris County Prosecutor, attorney for respondent (Tiffany M. Russo, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant A.B. appeals from the July 7, 2023 judgment of conviction entered after he was found guilty by a jury of sexually assaulting T.R. when the victim was eight years old.[1] He also appeals from the September 29, 2022 order granting the State's motion to admit fresh complaint testimony, and the May 19, 2023 order denying his motion for judgment of acquittal or a new trial. We affirm.

The State alleged that on October 28, 2017, T.R., T.R.'s mother, A.R., stepfather, V.D., and four siblings, M.D., E.D., J.G.D., and E.R., were spending the night at the home of defendant, his wife, K.B., and their son, in Denville. During the night, defendant sexually assaulted T.R. On January 11, 2022, T.R. reported the abuse to A.R. Defendant was indicted for first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1); second-degree sexual assault, N.J.S.A. 2C:14-2(b); and third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1).

---

[1] At the time of the sexual assault, the victim identified as a female and used the name R.R. At the time of trial, the victim identified as a male and used the name T.R. We therefore refer to the victim as T.R. and use gender-neutral pronouns where appropriate. We utilize initials to protect the confidentiality of victims of sexual assault or abuse. R. 1:38-3(c)(9).

## I.

The State moved to admit evidence of T.R.'s January 11, 2022 disclosure to A.R. as evidence of a fresh complaint. On September 12, 2022, the court conducted an evidentiary hearing at which A.R. testified. Defendant was a close family friend. V.D. was friends with defendant since V.D. was twelve years old.

On January 7, 2022, A.R.'s six-year-old daughter, E.R., told her that on December 23, 2021, E.R. and defendant were alone together in Lyndhurst when defendant asked E.R. to spit in her hand.[2] E.R. said she thought "he asked for it because he needed to rub his tummy . . . . But when she looked over . . . it was[ not] his tummy that he was rubbing" but "his private parts." On January 11, 2022, A.R. and E.R. met with the Bergen County Prosecutor's Office to report E.R.'s allegations.

After A.R. arrived home from that meeting, she wanted to speak with T.R., who was thirteen years old at the time, to "fill [T.R.] in" about "what was going on." While alone in T.R.'s bedroom, A.R. asked T.R. if "anyone has ever touched [T.R.] inappropriately[?]" T.R. "stopped moving," "froze," and "asked why[?]" A.R. repeated her question "more sternly." T.R. responded that "a few

---

[2] The child is identified as E.R. during the fresh complaint hearing and as E.D. at trial. For consistency and to distinguish E.R. from another child with the initials E.D., we refer to her as E.R. throughout this opinion.

years ago[, when T.R.] was probably seven or eight[,] when [the family] w[as] sleeping over [at defendant's] house[,] . . . [defendant] had come into the room . . . and . . . used his tongue at [T.R.'s] private area." T.R. "motioned [their] hands in circles around [T.R.'s] vagina" and said defendant "used his tongue at [T.R.'s] private area."

A.R. "screamed in pain," left the bedroom, and returned approximately three minutes later. She asked T.R. if defendant did anything else, to which T.R. answered in the negative. T.R. was "sad and scared" throughout the disclosure.

A.R. reviewed pictures and social media posts to determine when the incident occurred. She found a Facebook post with a date stamp of October 28, 2017, that depicted A.R. and her children sitting in a vehicle. The caption stated they "were ready for a sleep over." A.R. concluded October 28, 2017 was the date of the incident because T.R. only slept over at defendant's house once.

A.R.'s relationship with T.R. was "close." They never discussed sex prior to T.R.'s disclosure but did talk about "private parts" and how "no one is supposed to be touching them." A.R. believed T.R. was not aware of the December 23, 2021 incident involving E.R. and defendant before the disclosure. According to A.R., T.R. waited so long to tell her what happened because T.R. "knew that [V.D.] had known [defendant] for so many years and that he was

4

such a close family friend, he was there every Friday, [so T.R.] was nervous to have to tell [T.R.'s parents]."

On September 29, 2022, the court entered an order granting the State's fresh complaint motion supported by an oral opinion. The court found A.R. "to be a credible witness." Pursuant to State v. Hill, 121 N.J. 150 (1990), the court found evidence of T.R.'s disclosure to A.R. was admissible as a fresh complaint. It found the statement was made to someone T.R. would have ordinarily turned to for support. "[T]he victim's relationship with the interviewer is one that certainly would lead to reliability. The . . . relationship was . . . strong and . . . consistent with someone [T.R.] would make this type of disclosure to."

It found the disclosure was made within a reasonable time after the alleged assault. The court determined "the time frame is reasonable considering the juvenile's age at the time the events occurred coupled with . . . the relationship between . . . defendant and the juvenile's father[,] . . . which certainly caused [T.R.] distress in disclosing the actions that occurred at . . . defendant's residence."

The court also determined the disclosure was spontaneous and voluntary, finding:

> [W]hen [A.R.] confronted [T.R.], she asked open-ended
> questions without suggesting . . . defendant as the

target, and there was no suggestion as to the physical allegation that was described by [T.R.]. The [c]ourt also notes that the allegations between E.R. and [T.R.] are certainly dissimilar. And, as [the court] previously stated, after disclosure of E.R., there had been no unsupervised contact [with] E.R.

The [c]ourt, in considering the circumstances under which the interview occurred, notes that there was police activity earlier in the residence. This interview occurred in a neutral location, specifically [T.R.]'s bedroom, and [A.R.] simply asked one open-ended question which certainly was not suggestive[,] and it spontaneously triggered an emotional reaction of the juvenile. . . . [T]his [c]ourt does not find that the interview was initiated in a suggestive manner.

## II.

Trial was conducted from January 23 to 27, 2023. T.R., who was then fourteen years old and in eighth grade, testified defendant was a "friend of" V.D., was like "an uncle," and T.R. saw him "every other Sunday[,] . . . especially during football season." Defendant sexually assaulted T.R. "[t]he night . . . [the] family . . . spent the night at [defendant's] house" when T.R. "was around eight." T.R. was at defendant's house with T.R.'s parents and "siblings[,] including [T.R.'s] step-brothers," M.D. and E.D. The children "would play games" and T.R. left the room to watch "America's Got Talent" on a "tablet." They ate pizza and went to sleep.

A-3862-22

T.R. went to sleep in the second-floor guest bedroom with T.R.'s "siblings and . . . parents." T.R. slept on a mattress "[o]n the far corner on top of the room" by the doorway, while the parents slept on the "left bottom corner of the room."

Defendant "came into the room." T.R. "heard him open the door and . . . saw . . . his shadow" on the wall because there was a light on in the hallway. There were no lights on in the bedroom. Nobody else was awake in the room. T.R. "looked back and . . . saw him . . . in the hallway." "He started coming into the room" and "pulled down [T.R.'s] shorts" and underwear. After that, he "used his tongue" on T.R.'s "vagina" on "[t]he inside and the outside" for "[a]pproximately ten minutes." T.R. "tried stopping him" using T.R.'s legs. Defendant touched T.R.'s legs "[a]round the inner thigh and . . . knees to . . . keep [T.R.'s] legs open." Defendant did not say anything.

He then "grabbed [T.R.] by [the] wrist and pulled [T.R.] downstairs . . . through the kitchen to the living room." They "had . . . this conversation, but [T.R. does not] remember what it was." Defendant asked to see T.R.'s "vagina" but T.R. "said no." After that, "[h]e sort of backed off a bit."

V.D. "started to come downstairs" and defendant "told [T.R.] to lie" and say T.R. "was going to the bathroom." V.D. "came into the room," and "asked

7

[them] what [they] were doing." T.R. told V.D. defendant "was showing [T.R.] where the bathroom was" and defendant said "yeah . . . that[ is] what [they] were doing." V.D. told T.R. to use the bathroom upstairs, and T.R. went back to the bedroom. T.R. went back to sleep for the rest of the night. The next morning, T.R. went downstairs, and the other children were already awake and playing video games. T.R. does not "remember much of the morning" before leaving defendant's house.

T.R. continued to see defendant on most Sundays but never slept at his house again. T.R. "felt disgusted" about what happened but did not tell anyone because T.R. "did[ not] know what it was and what it meant, and . . . was too scared to speak up." T.R. did not tell anyone about the incident until the disclosure to A.R. in 2022.

On cross-examination, T.R. did not recall where the siblings were sleeping or how many mattresses were in the bedroom. T.R. previously gave statements that A.R. was pregnant with E.R., but now recalls E.R. was already born and sleeping in the room. T.R. admitted to previously making inconsistent statements as to whether T.R.'s underwear was left upstairs or if defendant took the underwear downstairs.

A-3862-22

T.R. conceded in prior statements there was no mention of V.D. telling T.R. to use the bathroom upstairs after he found T.R. and defendant downstairs, or that they were in the living room as opposed to downstairs generally. Also, in prior statements T.R. did not mention defendant touching T.R.'s inner thighs. T.R. previously admitted to telling lies, "but nothing big. [T.R.] tell[s] lies that seem believable because [T.R.] base[s] them off of facts."

V.D. was close friends with defendant for many years and they saw each other "all the time." He and A.R. are in a relationship, and in October 2017, had one child together, E.R., who was an infant. T.R. and J.G.D. are A.R.'s children and his stepchildren. V.D. has two other children, E.D. and M.D.

On October 28, 2017, V.D. went to "hang out" at defendant's new home with A.R., T.R., and their other four children. They "[h]ung out, played video games[,] . . . people were drinking, having some drinks." Defendant, K.B., and A.R. were drinking. The kids were playing video games. V.D. and defendant were outside near the firepit in the backyard. They went to sleep around 3:00 a.m. V.D. slept in an upstairs bedroom with A.R., T.R., E.R., and J.G.D. He slept in a bed with A.R. and E.R. T.R. and J.G.D. "slept on the mattress on the floor" that was "in front of the door." M.D. was in defendant's son's room.

A-3862-22

He woke "up at one point and saw that [T.R.] was[ not] in the bed," and "[t]he door was open." There "might have been a light on in the hallway." He "got up to go look for" T.R. and "went downstairs" because he did not "see [T.R.] upstairs." Once downstairs, he "went toward[] the bathroom and . . . saw [defendant] and [T.R.] standing there by the bathroom." Defendant "just looked drunk," but was "not stumbling" or slurring his words. T.R. looked "[t]ired, sleepy."

V.D. "asked what was going on. [Defendant] said that . . . [T.R.] was looking for the bathroom." He asked if T.R. used the bathroom and T.R. "said yes. And, then that was it." He did not recall if T.R. used the downstairs bathroom and denied telling T.R. to use the upstairs bathroom. V.D. "told [defendant] to go to bed . . . and then went to bed." He did not know when defendant went back upstairs. Nothing else happened that night. The next morning, "the kids got up and had breakfast, and then shortly after that [they] all went home."

On cross-examination, V.D. conceded he did not recall where in the bedroom J.G.D. slept. He also could not recall if E.D. slept in that room. He thought "there might have been another . . . blow up mattress in there, too" in addition to the mattress near the door.

10

A.R. testified consistent with her testimony at the fresh complaint hearing but did not mention the allegations by E.R. against defendant. On October 28, 2017, defendant was playing video games and drinking. She believed defendant was drunk because "they were up . . . late." She "went to bed first with the baby[, E.R.,] and it was already [1:00] a.m." T.R., E.R., and J.G.D. were also in the room with her. V.D. was "still hanging out with" defendant. "M.D. was sleeping with [defendant's son], . . . in his room."

The upstairs bathroom light was on, and the bathroom door was open. She "had to close the door, because it was annoying" her. At one point during the night, she woke up because V.D. "came back into the room." She "asked him where he went. And[] he said [T.R.] was in the bathroom downstairs, so he brought [T.R.] back up." She "went back to sleep."

The next morning was normal. They "had breakfast, got the kids together, [and] packed up [their] things." T.R. "looked . . . ready to go home." T.R. "[n]ever . . . tried . . . going back to that house" and never slept over there again. T.R. went to the house "two more times after that" for Thanksgiving and E.R.'s fourth birthday.

On cross-examination, A.R. testified defendant was drinking that night but he does not drink "excessively" when K.B. is around. She conceded in prior

11

statements she said defendant does not drink at all when K.B. is around. She also testified she is not certain E.D. was in the room with her that night and does not "know exactly where he fell asleep."

The State rested following A.R.'s testimony. Defendant moved for judgment of acquittal pursuant to Rule 3:18-1 on count two of the indictment, second-degree sexual assault. He argued T.R.'s testimony defendant touched the inner thighs was inconsistent with T.R.'s prior statements. Giving all favorable inferences to the State, the court denied the motion, finding T.R. testified "defendant did make contact with the inner thighs. And . . . [T.R.] did attempt to resist by . . . closing [T.R.'s] legs . . . ."

K.B. testified for the defense. On October 28, 2017, she and defendant spent the day with their son and her cousin's family at a farm. They left the farm to return home at approximately 7:00 p.m. Defendant told her he received a message from V.D. "saying that they would like to come over to visit" to see their new home and "spend some time together." K.B. "was not happy at all because it was not planned. . . . [They] were already tired, it was very late, and [she] had [made] no preparations for . . . any visitors in the house." They arrived home around 8:30 p.m. and ordered pizza for delivery. The pizza was there when V.D. and his family arrived "between 9:00 and 9:30 p.m."

A-3862-22

"But . . . they arrived with a big duffle bag . . . . And they self-invited themselves . . . ." K.B. and defendant "were not aware of and . . . had no plans to invite anybody to . . . visit. So sleeping over was not even a question." She was displeased "with this decision . . . because . . . [they] had just recently moved in," and "it was not organized." She does not "like to invite people when stuff is all over and [she is] not ready for them."

K.B. "was really mad" they were sleeping over. She "had to go and prepare" the spare bedroom "for them to sleep." She put "two spare mattresses . . . on the floor together for five people." There was no air mattress in the room. A.R. was the first person to go to sleep. E.R "was crying a lot" and "between [12:45] and 1:00[, A.R.] took her upstairs just to put her to sleep." K.B. took A.R. to the bedroom "to show it to her."

The others were still downstairs. K.B. was sitting with T.R. in the kitchen, the other children were playing video games, and defendant was in the backyard "hanging out with" V.D. Defendant had "a couple drinks" of "scotch." He was not intoxicated. Nobody else drank that night. "Around . . . 2:45[] . . . the kids and . . . [V.D.]" went upstairs. A.R., V.D., E.R., J.G.D., and T.R. slept in the spare bedroom. M.D. and E.D. slept in K.B.'s son's room, which is next to the spare bedroom. Defendant "came upstairs as well around 3:00. And . . . [they]

13

had some argument[ in their bedroom] about [the] whole . . . scenario that happened, which [she] was not very happy about."

He "tried to . . . calm [her] down a little bit and then said that he[ is] just going to go . . . set the alarms downstairs and go check the back door if it[ is] locked or not." He left the door open when he left, and the dog followed him. She remembered hearing attachments on the dog's collar "ringing" as the dog followed defendant from the room. After a "few minutes, like under five minutes or so, like three to five minutes," she "heard [defendant] . . . talking to someone." "[A]fter he came in the bedroom[, she] asked him who he was speaking to," and he said "he was speaking to" V.D. and T.R. V.D. and T.R. went into the bedroom, and defendant "came in, . . . went to bed, [K.B.] closed the door, . . . and then he went to sleep."

K.B. testified the light in the upstairs bedroom was off because visitors do not use that bathroom. The upstairs bathroom is only for her son and her family. The next morning, she "woke up between . . . 6:15, 6:30" and "went downstairs." Her son, E.D., and M.D. were playing video games. T.R. was "sitting in the family room . . . where the [kids] were playing." T.R. was watching an iPad. K.B. "chatted with" T.R., who "did not mention anything . . . out of [the] ordinary or had any difference in . . . behavior . . . that could be alarming." T.R.

14                                                                                    A-3862-22

was "pleasant like . . . the previous night." K.B. did not make breakfast. The only thing to eat was leftover pizza from the night before. V.D. and his family left "around like 11:00 . . . 10:30[ or] 11:00 [a.m.]."

K.B. testified T.R. was at her house "[m]any times during . . . family get togethers, . . . [and] parties" and they went to "beaches together." She did not "notice anything different about [the way T.R.] . . . would interact with [her]." T.R. was "a very pleasant" person, "always happy, running around . . . and just playing with [the other kids] – no difference at all." There was also no difference in the way T.R. interacted with defendant. T.R. "was very pleasant with him as well."

Defendant did not testify, and the defense rested. Defendant renewed the motion for judgment of acquittal without expanding on the argument previously made. Giving the State the benefit of all reasonable inferences and considering the evidence offered by the defense, the court denied the motion finding T.R.'s testimony satisfied "all elements of the three offenses that are charged."

On January 27, 2023, the jury convicted defendant on all counts. Defendant filed a motion for judgment of acquittal pursuant to Rule 3:18-2 or for a new trial pursuant to Rule 3:20-1. He argued judgment of acquittal should be granted because "no trier of fact could rationally have found beyond a

reasonable doubt that the essential elements of these particular crimes . . . were actually present." Defendant's argument was premised on "the actual inconsistencies in the testimony. Specifically, . . . the testimony of [T.R.] . . . which is such a degree that they have to call into question the veracity of all the accounts that were given . . . ." The motion was based on "the issue of . . . veracity and the varying accounts."

Defendant argued he was entitled to a new trial because the verdict was against the weight of the evidence. He asked the court to "take into consideration the testimony that was elicited during the trial, the totality of the evidence . . . and to correct an injustice . . . from what [was] . . . obviously jury error." Defendant argued "the inconsistencies . . . in this matter are so blaring and of such importance, that they have be looked at again. They have to be sifted through, they have to be properly analyzed." The jury "considered [T.R.'s] statement in a vacuum without giving due regard to the other testimony . . . that was full of inconsistencies."

After hearing oral argument, on May 19, 2023, the court entered an order denying the motion supported by an oral opinion. It denied the motion for judgment of acquittal finding "the evidence . . . viewed most favorably to the State certainly permits a jury to find . . . defendant committed the crimes

A-3862-22

charged beyond a reasonable doubt." The inconsistencies identified do not "illustrate that the jury acted irrationally or without reason," and the "jury acted rationally and reasonably."

The court denied the motion for a new trial because it could not "find that it clearly and convincingly appears that there was a manifest denial of . . . justice under the law." Defendant failed to demonstrate the verdict "was the result of partiality, passion, prejudice[,] . . . mistake[,] or any other grounds that would constitute a manifest denial of justice." The verdict "was not against the weight of the evidence."

After an appropriate merger, defendant was sentenced to twenty-nine years in prison, subject to a twenty-five-year period of parole ineligibility for first-degree aggravated sexual assault pursuant to the Jessica Lunsford Act, N.J.S.A. 2C:14-2(a)(1), and subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. He was sentenced to a concurrent term of six years, subject to NERA, for second-degree sexual assault. The sentence included reporting and registration requirements of Megan's Law, N.J.S.A. 2C:7-2, and parole supervision for life, N.J.S.A. 2C:43-6.4.

Defendant raises the following points on appeal.

POINT I

REVERSAL IS REQUIRED DUE TO THE PROSECUTION'S EXPRESSION OF PERSONAL OPINIONS [AND] INACCURATE ASSERTIONS DURING ITS SUMMATION.

POINT II

THERE WAS INEFFECTIVE ASSISTANCE OF COUNSEL BELOW DEMONSTRATING SEVERE PREJUDICE [AND] RESULTING [IN AN] INJUSTICE, NECESSITATING REVERSAL [AND] REMAND FOR A NEW TRIAL.

POINT III

DEFENDANT'S THREE MOTIONS FOR ACQUITTAL SHOULD HAVE BEEN GRANTED.

POINT IV

THE PROSECUTION'S "FRESH COMPLAINT" EVIDENCE SHOULD NOT HAVE BEEN ALLOWED, [AND] ITS USE AT THE TRIAL WAS IMPROPERLY PREJUDICIAL TO THE DEFENSE.

POINT V

DEFENDANT SHOULD BE GRANTED A NEW TRIAL[] IN THE EVENT HE IS NOT GRANTED AN ACQUITTAL ON THIS APPEAL.

III.

We are not persuaded by defendant's argument reversal is required based on comments made during summation. This argument is raised for the first time on appeal, and we review it for plain error.

When a party does not object to an alleged trial error or otherwise properly preserve the issue for appeal, it may nonetheless be considered by the appellate court if it meets the plain error standard of Rule 2:10-2. State v. Singh, 245 N.J. 1, 13 (2021); State v. Gore, 205 N.J. 363, 383 (2011). Rule 2:10-2 prescribes "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result." "The mere possibility of an unjust result is not enough." State v. Funderburg, 225 N.J. 66, 79 (2016). The plain error standard requires a determination of: "(1) whether there was error; and (2) whether that error was 'clearly capable of producing an unjust result,' R[ule] 2:10-2; that is, whether there is 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Dunbrack, 245 N.J. 531, 544 (2021) (quoting Funderburg, 225 N.J. at 79).

Defendant contends the prosecutor improperly told the jury K.B. "chose lies to tell you all. She chose lies based upon real facts. She chose lies based

upon things that happened that night, and she made those lies . . . seem believable." He also claims the prosecutor improperly argued defendant "controll[ed] the stories" because he was the source of certain aspects of K.B.'s testimony. Specifically, K.B. testified "after [defendant] came back into the room[,] she heard voices. She heard . . . defendant with someone. And how did she learn what happened? From . . . defendant."

Defendant contends the prosecutor improperly vouched for the truthfulness of the State's witnesses. He argues the State told the jury T.R.'s "reaction" when testifying "tells you [T.R.] was telling the truth," and T.R. was

> very honest with you. [T.R.] told you when there was a question . . . [T.R.] did[ not] understand . . . or . . . when there was . . . a fact that [T.R.] did[ not] remember. But what [T.R.] did tell you is that [T.R.] remembered . . . defendant performing cunnilingus on [T.R.] and [T.R.] told you that when [T.R.] . . . said that to you [T.R.] was not lying.

Defendant contends the State also improperly vouched for V.D. by saying his testimony was consistent with T.R.'s and showed T.R. was telling the truth because V.D. "has no reason to lie to you" based on his close friendship with defendant.[3]

---

[3] Without citation to the record, defendant contends the prosecutor made false statements of fact during summation. Our independent review of the record leads us to conclude this claim lacks merit.

Generally, "[p]rosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." State v. Williams, 471 N.J. Super. 34, 43 (App. Div. 2022) (quoting State v. Frost, 158 N.J. 76, 82 (1999)). "A prosecutor must 'conscientiously and ethically undertak[e] the difficult task of maintaining the precarious balance between promoting justice and achieving a conviction,' ensuring that at all times [their] 'remarks and actions [are] consistent with [their] duty to ensure that justice is achieved.'" State v. Jackson, 211 N.J. 394, 408 (2012) (first and third alterations in original) (quoting State v. Williams, 113 N.J. 393, 447-48 (1988)).

"A prosecutor may argue that a witness is credible, so long as the prosecutor does not personally vouch for the witness or refer to matters outside the record as support for the witness's credibility." State v. Walden, 370 N.J. Super. 549, 560 (App. Div. 2004) (citing State v. Scherzer, 301 N.J. Super. 363, 445 (App. Div. 1997)). "A prosecutor is not forced to idly sit as a defense attorney attacks the credibility of the State's witnesses; a response is permitted." State v. Hawk, 327 N.J. Super. 276, 284 (App. Div. 2000) (citing State v. C.H., 264 N.J. Super. 112, 135 (App. Div. 1993)); see also State v. Engel, 249 N.J. Super. 336, 379 (App. Div. 1991) (explaining a prosecutor may respond in

21

summation to defense counsel's insinuation the State's witnesses had lied and framed the defendant).

However, "[e]very prosecutorial misstep [in summation] will not warrant a new trial." State v. Garcia, 245 N.J. 412, 436 (2021). "Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." State v. R.B., 183 N.J. 308, 333 (2005) (quoting Frost, 158 N.J. at 82-84).

To determine whether a prosecutor's improper comments in summation warrant reversal, we assess whether the impropriety was "so egregious that it deprived the defendant of a fair trial." Williams, 471 N.J. Super. at 45 (quoting State v. Smith, 167 N.J. 158, 181 (2001)). "Thus, '[t]o justify reversal, the prosecutor's conduct must have been "clearly and unmistakably improper," and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of [their] defense.'" State v. Wakefield, 190 N.J. 397, 438 (2007) (first alteration in original) (quoting State v. Papasavvas, 163 N.J. 565, 625 (2000)).

We "must assess the prosecutor's comments in the context of the entire trial record," State v. Nelson, 173 N.J. 417, 472 (2002) (citing State v. Morton, 155 N.J. 383, 419-20 (1998)), including whether the trial was lengthy, and the

prosecutor's remarks were short or "errant." Engel, 249 N.J. Super. at 382. A "single metaphor" or instance of "name-calling" will not rise to the level of reversible misconduct if it does not implicate the defendant's right to a fair trial. Wakefield, 190 N.J. at 467 (declining to reverse where prosecutor likened defendant to "the wolf taking the lives of the two helpless sheep").

We are satisfied the prosecutor's statements were proper and certainly were not so egregious that they "substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." Id. at 438.

It was fair for the prosecutor to argue to the jury K.B. told lies interspersed with "real facts" to make them believable. For example, K.B. weaved undisputed facts such as that defendant went downstairs and was talking with V.D. and T.R. into her claim defendant was only out of the room for three to five minutes. It came as no surprise to the jury the State contended K.B.'s testimony, for example, that she distinctly recalled defendant was gone for three to five minutes, was untruthful. The prosecutor was permitted to argue to the jury K.B. was attempting to make what the State argued was incredible testimony believable by incorporating undisputed facts.

Likewise, it was appropriate for the prosecutor to highlight for the jury

critical aspects of K.B.'s testimony came from defendant. This included her testimony that defendant spoke with T.R. and V.D. when he was downstairs. It was undisputed the information she learned came from defendant.

We are not persuaded by the claim the prosecutor improperly vouched for T.R. and V.D. The prosecutor argued the jury should find T.R. credible because T.R. admitted to not recalling certain facts or not understanding certain questions. In addition, on direct examination, T.R. testified T.R. was "[t]elling the truth" and not lying. There was no reason the prosecutor could not remind the jury of that testimony. It was proper for the prosecutor to argue V.D. had no reason to lie based on his close relationship with defendant and to assert V.D.'s testimony corroborated that of T.R. and showed T.R. was not lying.

Although the prosecutor's arguments were harsh in some respects, prosecutors can "strike hard blows . . . [but not] foul ones." State v. Echols, 199 N.J. 344, 359 (2009) (alterations in original) (quoting Wakefield, 190 N.J. at 436). We discern no basis to find error, much less plain error.

IV.

We are satisfied the court appropriately granted the State's motion to admit fresh complaint evidence. "The determination [of] whether the fresh complaint rule's conditions of admissibility have been satisfied is committed to

24

the discretion of the trial court." State v. C.W.H., 465 N.J. Super. 574, 600 (App. Div. 2021) (quoting State v. L.P., 352 N.J. Super. 369, 380-81 (App. Div. 2002)). Accordingly, an appellate court will review such a determination for an abuse of discretion, which "may be found if the trial court made a 'clear error of judgment.'" Ibid. (quoting State v. Brown, 170 N.J. 138, 147 (2001)).

The fresh complaint doctrine is an exception to the hearsay rule recognized by our Supreme Court that "allows witnesses in a criminal trial to testify to a victim's complaint of sexual assault." Hill, 121 N.J. at 151. The limited purpose of fresh-complaint testimony is to rebut the inference that the victim's initial silence was inconsistent with later claims of abuse. Id. at 151-52. For the fresh-complaint doctrine to apply, the proponent of the evidence must establish: (1) the victim of the sexual assault disclosed the crime to a natural confidante, whom the victim would ordinarily turn to for support; (2) the disclosure was spontaneous and voluntary; and (3) the disclosure was made within a reasonable time after the alleged assault. State v. R.K., 220 N.J. 444, 455 (2015).

In determining whether a complaint was made within a reasonable time after the act(s) occurred, the duration between the incident(s) and the reporting does not bar the statement if explainable by the youth of the victim in light of

the circumstances, such as being cajoled and coerced into remaining silent by their abusers. State v. Bethune, 121 N.J. 137, 143 (1990). Child victims may be reluctant to talk about sexual assault, given their limited understanding of what was done to them. State v. P.H., 178 N.J. 378, 393 (2004).

Because children may be too embarrassed and scared to discuss sexual abuse, it is necessary to be flexible in the application of the fresh complaint rule for child victims of sex crimes. Bethune, 121 N.J. at 143. "[A] substantial lapse of time between the assault and the complaint may be permissible if satisfactorily explainable by the age of the victim and the circumstances surrounding the making of the complaint." State v. Pillar, 359 N.J. Super. 249, 281-82 (App. Div. 2003).

Defendant argues the court erred by granting the motion because the "fresh complaint was obtained coercively, with the type of pressure that only a mother can present." He also argues the testimony should not have been allowed because the statements were made "a half-decade" after the incident and T.R. "was only [eight] years old, in the middle of the night" and "half asleep." We are not convinced.

The court determined A.R. was a credible witness and found the disclosure was spontaneous and voluntary. It found T.R. "was asked open-ended

26                                                                              A-3862-22

questions," and there was "no suggestion as to the physical allegation that was described." The court found the disclosure occurred "in a neutral location," and A.R.'s question "spontaneously triggered an emotional reaction." It also concluded the disclosure was made within a reasonable amount of time given T.R.'s age and defendant's relationship with V.D., "which certainly caused her distress in disclosing the" sexual assault.

The court's findings were based on its determination of credibility and are amply supported by the record. We do not discern any basis to disturb the court's decision to grant the motion.

V.

The court correctly denied defendant's motions for judgment of acquittal. We review trial court's decision on a judgment of acquittal de novo, see State v. Williams, 218 N.J. 576, 594 (2014), and "owe no deference to the findings of . . . the trial court," State v. Lodzinski, 249 N.J. 116, 145 (2021). We "apply the same standard as the trial court to decide if the trial judge should have granted a judgment of acquittal." State v. Sugar, 240 N.J. Super. 148, 153 (App. Div. 1990).

"Rule 3:18-1 provides that a court must enter a judgment of acquittal after the close of the State's case or after the close of the defendant's case if 'the

27

evidence is insufficient to warrant a conviction.'" Lodzinski, 249 N.J. at 143.

"Rule 3:18-2 is an additional safeguard, authorizing a court to enter a judgment

of acquittal even after the return of a verdict of guilty, when the evidence does

not rationally support a conviction." Ibid. "The power to enter a judgment of

acquittal cannot be invoked because a judge has a mere difference of opinion

with the outcome of a trial; it can be invoked only to prevent a miscarriage of

justice." Id. at 143-44.

The applicable "standard is the same whether the motion is made at the

close of the State's case, at the end of the entire case, or after a jury returns a

guilty verdict under Rule 3:18-2." State v. Fuqua, 234 N.J. 583, 590 (2018). A

motion for a judgment of acquittal will not be granted if

> the evidence, viewed in its entirety, be it direct or
> circumstantial, and giving the State the benefit of all of
> its favorable testimony as well as all of the favorable
> inferences which reasonably could be drawn therefrom,
> is sufficient to enable a jury to find that the State's
> charge has been established beyond a reasonable doubt.
>
> [Id. at 590-91 (quoting State v. Kluber, 130 N.J. Super.
> 336, 341-42 (App. Div. 1974)).]

N.J.S.A. 2C:14-2(a)(1) provides:

> An actor is guilty of aggravated sexual assault if the
> actor commits an act of sexual penetration with another
> person under any one of the following circumstances:

28

(1) The victim is less than [thirteen] years old . . . .

"'Sexual penetration' means vaginal intercourse, cunnilingus, fellatio[,] or anal intercourse between persons or insertion of the hand, finger[,] or object into the anus or vagina either by the actor or upon the actor's instruction."  N.J.S.A. 2C:14-1(c).

N.J.S.A. 2C:14-2(b) provides "[a]n actor is guilty of sexual assault if the actor commits an act of sexual contact with a victim who is less than [thirteen] years old and the actor is at least four years older than the victim."  "'Sexual contact' means an intentional touching by the victim or actor, either directly or through clothing, of the victim's or actor's intimate parts for the purpose of degrading or humiliating the victim or sexually arousing or sexually gratifying the actor."  N.J.S.A. 2C:14-1(d).

N.J.S.A. 2C:24-4(a)(1) states:

> Any person having a legal duty for the care of a child or who has assumed responsibility for the care of a child who engages in sexual conduct which would impair or debauch the morals of the child is guilty of a crime of the second degree.  Any other person who engages in conduct or who causes harm as described in this paragraph to a child is guilty of a crime of the third degree.

"'Child' means any person under [eighteen] years of age."  N.J.S.A. 2C:24-14(b)(1).  The term "sexual conduct" is not defined in the statutory scheme.  To

29                                                    A-3862-22

be sure, sexual conduct that would impair or debauch the morals of a child encompasses sexual contact, as that latter term is defined by the sexual assault statute. See State v. Bryant, 419 N.J. Super. 15, 24 (App. Div. 2011) (noting that overtly sexual acts committed by a defendant upon a child constitute "sexual conduct" within the meaning of N.J.S.A. 2C:24–4(a)).

There is no dispute the State proved T.R. was less than thirteen years old on October 28, 2017. Giving the State the benefit of all favorable inferences, T.R.'s testimony defendant performed cunnilingus on T.R. and touched T.R.'s inner thigh during the sexual assault is sufficient to satisfy the elements of the three charged offenses. The court correctly denied defendant's post-verdict motion for acquittal pursuant to Rule 3:18-2. Defendant's motions for judgment of acquittal made at the close of the State's case and after the close of all evidence pursuant to Rule 3:18-1 were properly denied for the same reasons.

## VI.

We are satisfied the court correctly denied defendant's motion for a new trial. "[A] motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown." State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000) (citing State v. Artis, 36 N.J. 538, 541 (1962)).

A-3862-22

Rule 3:20-1 provides, in pertinent part:

> The trial judge on defendant's motion may grant the defendant a new trial if required in the interest of justice. . . . The trial judge shall not, however, set aside the verdict of the jury as against the weight of the evidence unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law.

"Where the jury's verdict was grounded on its assessment of witness credibility, a reviewing court may not intercede, absent clear evidence on the face of the record that the jury was mistaken or prejudiced." State v. Smith, 262 N.J. Super. 487, 512 (App. Div. 1993) (citing State v. Haines, 20 N.J. 438, 446-47 (1956)). Indeed,

> a reviewing court should not overturn the findings of a jury merely because the court might have found otherwise if faced with the same evidence. State v. Hodgson, 44 N.J. 151, 162-63 (1965). Faith in the ability of a jury to examine evidence critically and to apply the law impartially serves as a cornerstone of our system of criminal justice. Unless no reasonable jury could have reached such a verdict, a reviewing court must respect a jury's determination.
>
> [State v. Afanador, 134 N.J. 162, 178 (1993).]

Defendant contends he was entitled to a new trial because the "material, repeated transgressions of the prosecution during summation were[,] . . . or should have been apparent to the trial judge." He also argues

31

there was no testimony corroborating the acts of alleged assault, and no DNA or other physical evidence. This case turned on a credibility contest between a [fourteen]-year-old testifying about what allegedly happened . . . when [T.R.] was an [eight]-year-old, on the one hand, and . . . [K.B.], on the other hand, whose unimpeached testimony was that [defendant] was out of her physical presence for only five minutes.

As defendant concedes, the jury's verdict was grounded on its assessment of witness credibility. As discussed earlier in this opinion, we are not convinced by defendant's claims of prosecutorial "transgressions." Defendant's claim he should be granted a new trial based on inconsistencies in the witnesses' testimony is not convincing. Those inconsistencies were identified for the jury by defense counsel during his examination of the witnesses and in his summation. The jury evaluated the evidence, including any alleged inconsistencies and assessed the credibility of the witnesses.

There is no basis to find the jury was mistaken or prejudiced, or that there was a manifest denial of justice under the law. Defendant's new trial motion was properly denied.

## VII.

We decline to consider defendant's ineffective assistance of counsel claims on direct appeal. "Our courts have expressed a general policy against entertaining ineffective-assistance-of-counsel claims on direct appeal because

32

such claims involve allegations and evidence that lie outside the trial record." State v. Preciose, 129 N.J. 451, 460 (1992); see State v. Sparano, 249 N.J. Super. 411, 419 (App. Div. 1991) ("Generally, a claim of ineffective assistance of counsel cannot be raised on direct appeal."). That is particularly true where, as here, the allegations of ineffective assistance implicate strategic decisions of trial counsel that may necessitate an evidentiary hearing.

To the extent we have not addressed any remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division